SKIBS A/S SILJESTAD, as owner of the m/v Francisville, Libelant,

v.

S/S MATHEW LUCKENBACH and Luckenbach Steamship Corporation, Inc., Respondents.

LUCKENBACH STEAMSHIP CORPORA-TION, Inc., as owner of the S/S Mathew Luckenbach, Cross-Libelant,

v.

M/V FRANCISVILLE and Skibs A/S Siljestad, Cross-Respondents.

The EAST ASIATIC CO., Ltd., et al., Libelants,

v.

S/S MATHEW LUCKENBACH and Luckenbach Steamship Corporation, Inc., Respondents.

United States District Court
S. D. New York.
March 21, 1963.

Haight, Gardner, Poor & Havens, New York City, for Skibs A/S Siljestad, as owners of the m/v Francisville; Charles S. Haight, Gordon W. Paulsen, Richard G. Ashworth, New York City, of counsel.

Burlingham, Underwood, Barron, Wright & White, New York City, for Luckenbach S.S. Corp., Inc., as owner of the s/s Mathew Luckenbach; Eugene Underwood, Kenneth H. Volk, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for East Asiatic Co., Ltd., and others, as owners of the Francisville cargo; Donald M. Waesche, Jr., Julian S. Gravely, Jr., New York City, of counsel.

THOMAS F. MURPHY, District Judge.

These are cross-libels in admiralty by the owners of two radar equipped vessels, the Norwegian flag m/v FRANCIS-VILLE and the United States flag s/s MATHEW LUCKENBACH, arising out of a collision between them in Buzzards Bay in dense fog on July 29, 1959. Another libel is by cargo aboard the FRANCISVILLE to recove from the MATHEW LUCKENBACH interests general average payments totaling $60,000. All libels were consolidated for trial.

The principal issue is whether the MATHEW LUCKENBACH was contributorily at fault since the FRANCISVILLE concedes hers. We will first enumerate the undisputed facts.

The FRANCISVILLE is a 6087 gross ton twin-screwed motor vessel 467.5′ long, 59′ beam, and had a draft on departure of 12′ 8″ forward, 17′ 5″ aft. The MATHEW LUCKENBACH is a 7870 gross ton C-3 single screw vessel, 492′ long, 69.5′ beam, and had a draft on departure of 15′ forward, 19′ 6″ aft. The FRANCISVILLE was equipped with a Radio Marine radar model CR-101 with a 12″ scope. The MATHEW LUCKENBACH was equipped with a Raytheon Pathfinder radar with a 16″ scope. The FRANCISVILLE was equipped with a gyro compass repeater and a SAL log repeater; the MATHEW LUCKENBACH, with a course recorder.

The FRANCISVILLE left New York at 1824 on July 28, 1959, bound for Boston via Rhode Island Sound, Buzzards Bay and Cape Cod Canal. The MATHEW LUCK-ENBACH, bound from Boston to Philadelphia via Cape Cod Canal, Buzzards Bay, Rhode Island Sound, etc., left Boston at 0300 July 29, 1959. She was delayed at the entrance of the Cape Cod Canal because of fog, as were two other vessels, the Dutch flag KAMPERDYK and the Swedish flag VASAHOLM. When the fog lifted she proceeded through the Canal past the Cleveland East Ledge Light at the southerly end of the canal at 0442 July 29, 1959, followed by the KAMPERDYK and the VASAHOLM.

The FRANCISVILLE picked up her coast pilot, Begelman,[1] off Block Island at 0348 on July 29th and from then on the mas-

1. Begelman did not testify at the trial although available to both sides.

ter, Nyhuus, second officer Steiro and helmsman Thommensen, were on the bridge with the pilot at the conn. On the bow was the lookout, Settei. She came abeam of whistle buoy RW at 0432 and Buzzards Bay Light Vessel at 0535, maintaining a speed of 15¼ knots in dense fog and sounding fog signals. The tide was ebbing.

The MATHEW LUCKENBACH came abeam of buoy BB on her starboard at 0517 and set a course of 245° for buoy 3HC. She encountered fog at 0524 and started to sound her fog signals at regular intervals. Thereafter and until the collision the master, Hodson, coast pilot, Towne and second officer, Kaldefoss, were on the bridge with the pilot at the conn and an able-bodied seaman, Bauer, at the wheel. On the bow was lookout, Clemente. Her speed, at least until 0532, was 15½ knots.

At about 0536 the MATHEW LUCKENBACH observed the pip of the FRANCISVILLE on her radar eight miles distant and about a half-mile off Buzzards Bay Light Vessel. At no time did those on the bridge of the FRANCISVILLE observe on her radar the MATHEW LUCKENBACH or her two following vessels, the KAMPERDYK and the VASAHOLM, although she picked up the buoys and navigational aids on her northeast course to 3HC.

The FRANCISVILLE and the MATHEW LUCKENBACH collided at approximately 0549 and almost immediately the electricity on the FRANCISVILLE failed and she let go her anchor shortly thereafter. The FRANCISVILLE'S speed at the moment of collision was 10.9 knots and her heading 026½°.

In dispute are the various times involved, the bridge and engine room orders and records thereof, the time of collision, the angle of collision, the place of collision, the speed of the MATHEW LUCKENBACH, her use of her radar and, naturally, the credibility of the witnesses.

The FRANCISVILLE by formal amendment to her pleading has admitted that she failed to proceed at a moderate speed in fog and was in contributory fault.

Pursuant to a pretrial order the issues are defined as follows: "The issues of fact and law are whether the MATHEW LUCKENBACH was contributorily at fault and if she was, whether she is entitled to the benefit of the Major-Minor Fault Rule."

The FRANCISVILLE'S interpretation of the events and the causes of the collision is as follows:

Proceeding northeasterly from Block Island on a course of 040° with her radar picking up the buoys she came abeam of Buzzards Bay Light Vessel at approximately 0535 leaving the lightship a half-mile to starboard as observed by her radar. Continuing on 040° until abeam of buoy #1 (sometimes called 17 foot spot buoy) she changed course to 037° in order to get as close as possible to buoy 3 HC thereby providing a good departure point for the Cape Cod Canal approach. When 3HC was visually abeam to port a couple of ship lengths distant the FRANCISVILLE hauled to starboard for the next course 065° so that with the tidal set to starboard she would make good the 066° course for buoy BB.

Unaware of any other vessel (although her radar had worked well up to 3HC) she continued at unreduced speed sounding fog signals and relying upon her twin screws for backing power to take off her way in case of an oncoming vessel. She steadied on 065° and continued on that course for two or three minutes. Suddenly the MATHEW LUCKENBACH was sighted very close on the starboard bow at high speed. In rapid succession the FRANCISVILLE sounded a two-blast signal, put her rudder hard port, stopped her engines and sounded a danger signal. Upon seeing the MATHEW LUCKENBACH turning rapidly to her starboard the pilot ordered full astern and hard starboard in an effort to swing the FRANCISVILLE'S stern away from the MATHEW LUCKENBACH. The MATHEW LUCKENBACH'S bow struck the starboard side of the FRANCISVILLE amidships at right angles in the way of her engine room shorting her electric power.

FRANCISVILLE'S claim of the MATHEW LUCKENBACH'S movements is that after she came through the Canal followed by the KAMPERDYK and the VASAHOLM each proceeded at full speed ahead until they reached the vicinity of buoy BB where New York bound vessels turn to starboard and head for buoy 3HC. Although 3HC bears 246° from BB (the reciprocal of 066° course of the FRANCISVILLE) the MATHEW LUCKENBACH shaped her course to a heading of 245°. This heading of 245° with the southerly set of the half knot ebb tide brought the MATHEW LUCKENBACH along the line of buoys on the port hand heading on buoy 2B located 1⅓ miles from 3HC. The MATHEW LUCKENBACH, passing an eastbound vessel, reduced her speed from full ahead sea speed to full ahead maneuvering speed at 0527. The KAMPERDYK reduced her speed to half ahead; the VASAHOLM stopped her engines for three minutes at 0538 when passing an eastbound vessel and put them half ahead at 0541. The KAMPERDYK continued at half speed until 0546, as did the VASAHOLM.

From buoy BB the MATHEW LUCKENBACH first altered her course 5° to starboard for about two minutes, then to 243° for six minutes and returned to 245° at 0536. It was at this juncture that she first spotted the pip of the FRANCISVILLE eight miles away on her port bow when the FRANCISVILLE was abeam of the Buzzards Bay Light Vessel. When the MATHEW LUCKENBACH was near the Penikese Island Buoy she ordered 60 rpm's, still keeping her engines at full speed ahead. This gave her a speed of 15½ knots on a course 245°.

It is the claim of the FRANCISVILLE that had the MATHEW LUCKENBACH stayed on this course no collision would have occurred and all the vessels would have passed her starboard to starboard which she asserts is not unusual in these waters. Instead, without making any plot of her radar observations, the MATHEW LUCKENBACH thought that the FRANCISVILLE was going too far northward toward 3HC and at 0542½ rang for slow speed and changed her course

5° to starboard. These two maneuvers, the FRANCISVILLE claims, put her on a collision course and caused those on the MATHEW LUCKENBACH to be unable to follow and plot the speed and course of the FRANCISVILLE. It is argued that the slow speed order only slightly diminished her way since it takes considerable time for her to run off her momentum even when the engines are stopped.

At 0545 the MATHEW LUCKENBACH, becoming frightened of a possible collision, stopped her engines and altered her course to starboard again (instead of stopping she should have gone astern it is claimed). Thus by her repeated starboard alterations the MATHEW LUCKENBACH instead of (as she thought) allowing more room for a port to port passing was navigating to cross the course line of the FRANCISVILLE from the FRANCISVILLE'S starboard to port.

At 0548, when the MATHEW LUCKENBACH heard the two-blast signal from the FRANCISVILLE, she rang slow astern and then stop engines and blew a danger signal. Seconds later the FRANCISVILLE came into sight on her port bow and at 0548½ the MATHEW LUCKENBACH'S pilot ordered hard starboard and emergency full astern and sounded three blasts on the whistle followed by an extra full astern jingle and then a danger signal, all in rapid succession. About a half-minute after the MATHEW LUCKENBACH'S first full astern order the collision occurred.

The MATHEW LUCKENBACH'S interpretation of the events and causes of the collision is as follows:

After she passed Cleveland East Ledge Light at 0442 in clear weather she proceeded at full speed and came abeam of buoy BB at 0517 where she set her course at 245° for buoy 3HC. At 0524 fog was encountered and she began to sound her fog signals at regular intervals. At 0527 she reduced speed to full throttle or about 15½ knots and changed her course to 249° to give more room to a small vessel that was proceeding in the opposite direction and which she passed port to port. At 0530 she

changed course to 243° in order to regain her base course of 245° from buoy BB to buoy 3HC.

With the fog thickening at 0533 her engines were put on stand by and at 0536 her course was changed to 245°, her base course, heading almost directly for buoy 3HC. At this point she detected the pip of the FRANCISVILLE on her radar close to Buzzards Bay Light Vessel and from that time on kept her pip under close observation.[2] At 0541 speed was reduced to 60 rpm's or 12 knots. She then proceeded, keeping to her own starboard side of the channel, continuously keeping the pip of the FRANCISVILLE under close observation. It was apparent that the FRANCISVILLE was a large vessel proceeding at considerable speed and bound for the Cape Cod Canal. Those on the MATHEW LUCKENBACH thought that the FRANCISVILLE would have to, and would, change her course to the right after passing buoy #1 and buoy 2A and proceed between Mishaum Ledge and Penikese buoys and between Wilke's Ledge and #6 buoys and head for buoy BB, i. e., that she would follow a course parallel and opposite to that of the MATHEW LUCKENBACH and, of course, keep to her starboard side of the channel. However, close observation of the FRANCISVILLE by radar indicated that the FRANCISVILLE was proceeding further north and closer to 3HC than is usual for eastbound vessels. She knew that the FRANCISVILLE would have to change her course to the right otherwise she would end in the shoal waters immediately to the north of 3HC, viz., Chicadee Ledge. Therefore the MATHEW LUCKENBACH, to give the FRANCISVILLE more time and more room, at 0543, reduced her speed to slow ahead, i. e., 4 knots, and changed her course 5° to 250°. As she steadied on 250° the pip of 3HC bore 2° to 3° on her port bow and the pip of the FRANCISVILLE bore further on the port bow than the pip of 3HC.

At 0546 the FRANCISVILLE's pip still bearing several degrees on the port bow of the MATHEW LUCKENBACH and it appearing that she would pass port to port, a fog signal was heard from the FRANCISVILLE for the first time, apparently bearing about one point (11¼°) on the port bow. The MATHEW LUCKENBACH, pursuant to the second paragraph of Article 16 of the Inland Rules (33 U.S.C. § 192), stopped her engines and changed her course 5° more to the right to 255° to give the FRANCISVILLE still more room to pass port to port. At this time the MATHEW LUCKENBACH claims she had little headway and swung slowly. At 0548, when the MATHEW LUCKENBACH was almost dead in the water, she heard a two-blast signal from the FRANCISVILLE bearing broad on her port bow, but the FRANCISVILLE was not visible through the fog. The MATHEW LUCKENBACH immediately put her engines full speed astern and sounded the danger signal. She could not give a signal for passing since the rules prohibit this unless the vessels are in sight of each other. The captain of the MATHEW LUCKENBACH, watching the pip of the FRANCISVILLE, saw it move a point ahead of the MATHEW LUCKENBACH and reported to the pilot that "she is closing on our bow." The MATHEW LUCKENBACH's engines were already backing and her bow swinging to the right because she was without headway. At this point the captain, through the wheel house window, saw the FRANCISVILLE emerge from the fog bearing three or four points (33°–45°) on the port bow and at high speed turning sharply to her own left. He sounded the danger signal again; the engine telegraph was rung full speed astern again, but the FRANCISVILLE continued at undiminished speed in a hard left turn and impaled herself on the bow of the MATHEW LUCKENBACH which was at a standstill. The collision occurred at 0550. She claims that the initial angle of collision was about 53½° but

2. No log entry was made of this observation. It was the captain's recollection that the MATHEW LUCKENBACH was

somewhere between buoys 6A and Mischaum Ledge Buoy and on course 243°.

broadened with extreme rapidity to 90° or more due to the high speed of the FRANCISVILLE and the fact that she was in a sharp left turn. The place of collision was at a point about one mile in a general northeasterly direction from 3HC or substantially on a line between 3HC and Mishaum Ledge Buoy #3 i. e. on the MATHEW LUCKENBACH'S right hand edge of the channel which at that point was 1500 yards or about ¾'s of a mile wide.

After trial we accept the contentions of the FRANCISVILLE and reject those of the MATHEW LUCKENBACH, and find that the MATHEW LUCKENBACH was contributorily at fault and is not entitled to the benefits of the Major-Minor Fault Rule.

We are compelled to this finding because we are persuaded that her principal contentions are contrived*; her principal factual witnesses unworthy of belief; her records falsified, and her expert opinions based on false assumptions.

### Mathew Luckenbach's Speed

The Bridge Bell Book and Engine Room Bell Book of the MATHEW LUCKENBACH when compared furnish the first clue:

| Entries | Engineroom bellbook | Bridge bellbook |
|---|---|---|
| Full throttle | 0527 | 0527 |
| Standby | 0532 | 0533 |
| 20–40–60 | 0541 | 0541 |
| Slow ahead | 0542½ | 0543 |
| Stop | 0545 | 0546 |
| Slow astern | 0548 | Omitted |
| Stop | 0548 | Omitted |
| Full astern with jingle | 0548½ | 0548 (written on same line as 0546 entry) |
| "Rammed Norwegian vessel" | No entry | 0550 |
| Stop | 0549½ | Omitted |
| Full astern | 0551½ | 0552 |

* My use of the word "contrived" here and throughout this opinion relates only to my opinion of the testimony of witnesses and is not intended and does not reflect in anywise on the Mathew Luckenbach's proctors.

The Engine Room Bell Book gives 0548½ as the time for the first and only full astern order and this with a jingle.[3] The Bridge Bell Book records this order at 0548, but strangely enough it is written on the same line as the "stop" order at 0546. In addition, both books do not record the same time for the same orders, the Bridge Bell Book recording the slower time, and besides, the Bridge Bell Book omits three orders (slow astern, stop and stop) recorded in the Engine Bell Book. There is a spread of a half-minute to a minute between the two books for the same orders. We attach little importance to this discrepancy in the recorded times since the personal equation is always involved, but we do attach importance to the omissions in the Bridge Bell Book and the obvious irregular recording of the 0548 order for full astern on the 0546 line.

On balance we accept the Engine Room record of the times and orders as the more reliable. Cf. Villain & Fassio v. The E. W. Sinclair, 207 F.Supp. 700, 705 (S.D.N.Y., 1962), aff'd 313 F.2d 722 (2d Cir., Feb. 20, 1963); Weyerhauser Steamship Co. v. United States, 174 F. Supp. 663, 667 (N.D.Cal., 1959); The Benalla, 45 F.2d 864, 866 (S.D.N.Y., 1921); Beverly-Brinton, 1934 A.M.C. 316, 319 (S.D.N.Y., 1915).

These engine orders and their times, therefore, give us a starting premise from which many of the events can be analyzed, the first and foremost being the testimony of the watch officer of the MATHEW LUCKENBACH, Mr. Kaldefoss.

When Kaldefoss testified at the Coast Guard inquiry two days after the collision it was his sworn testimony that the *only* full astern order was given when the FRANCISVILLE was sighted. "[A]ll them orders came at the same time. In fact, the order for hard right came right before full astern so we executed it at the same time." When his deposition was taken on November 13,

3. It will be observed that there is another full astern order after the collision, two minutes after a stop order which was also after the collision. These orders are not in dispute and do not relate to the causes of the collision.

1959 (this is the deposition offered at trial) he testified that there were *two* full astern orders, the first one before the FRANCISVILLE was sighted.

The circumstances leading to this change in testimony are interesting and perhaps aggravating. At the very least they have led us to the belief that the MATHEW LUCKENBACH'S contentions as to her being dead in the water have been contrived. When the date for Kaldefoss's deposition had been fixed the MATHEW LUCKENBACH'S proctor sent him a five page letter explaining in detail why some of his answers to the Coast Guard officer were wrong. He also enclosed (a) a copy of his Coast Guard testimony (which Kaldefoss changed in his own handwriting in the office of the MATHEW LUCKENBACH'S proctor the day before his deposition was taken); (b) a digest of the same; (c) a memorandum of the sequence of events; (d) two copies of the Bridge Bell Book and (e) a copy of the rough deck log but no Engine Room Bell Book. The copy of the Coast Guard testimony so enclosed contained marginal notes and comments disagreeing with some of his answers, including the answer that the MATHEW LUCKENBACH was put full astern when the FRANCISVILLE was sighted. One helpful comment reads: "No— Full astern was given when F blew two & she was not yet in sight." To these interesting asides on the art of taking depositions must be added the fact that he did not have with him a copy of the letter counsel had sent and counsel refused at the deposition to produce a copy. However, a copy was produced and marked in evidence at the trial.

■ All of these uncontroverted facts lead us to an inescapable conclusion, viz., Kaldefoss's deposition testimony is unworthy of belief. They also cause us to take a long look at the MATHEW LUCKENBACH'S contentions. Cf. Lykes Bros. Steamship Co. v. Union Carbide & Carbon Corp., 253 F.2d 444, 448 (5th Cir., 1958).

The testimony of the MATHEW LUCKENBACH'S engine room watch fixed the collision time "about half way between 0548½ and 0549½." The Bridge Bell Book fixes 0550 as "Rammed Norwegian vessel." We fix the time of collision at 0549 or half a minute before the 0549½ engine room time for stop engines. These times and orders are significant and are also helpful in resolving other disputed facts. For one thing they establish that the MATHEW LUCKENBACH was put "slow astern" at 0548 and "full astern" at 0548½, and not full astern at 0548. In short the MATHEW LUCKENBACH was backing full astern for only 30 seconds before the collision. They tend, too, to corroborate the FRANCISVILLE'S claim of the time element involved because the FRANCISVILLE'S gyro compass repeater shows that she started to rapidly change course from 065° to 26½°, a minute before the collision. Therefore, she must have seen the MATHEW LUCKENBACH as her witnesses testified, otherwise there was no reason for such radical change of course.

These times and orders are also the basis for computing the speed of the MATHEW LUCKENBACH during the crucial period and comparing the testimony of FRANCISVILLE'S expert, Suarez, with the testimony of the MATHEW LUCKENBACH'S master and pilot. Captain Hodson and pilot Towne of the MATHEW LUCKENBACH testified that they had stopped for two minutes and were two minutes at full astern immediately before the collision and had virtually no forward way at the time of impact. As opposed to their testimony Suarez, an expert hydrodynamist, prepared a chart, graphically illustrating the headings, speeds and distances travelled by the MATHEW LUCKENBACH as follows:

S. S. Mathew Luckenbach

(Still Water Calculation)

| 1 | 2 | | 4 | 5 | 6 Nautical Miles | 7 |
| --- | --- | --- | --- | --- | --- | --- |
| Engine Room Time | Engine Revolutions | Engine Orders | Course Recorder Headings* | Speed in Knots | Along 245.5° | to Port or Starbd of 245.5° |
| 0443 | 84 | Full Ahead Sea | | | | |
| 0516 | | | 245.5 | 17.0 | 0 | 0 |
| 0516.1 | | | | | .115 | 0 |
| 0518 | | | | | .566 | 0 |
| 0520 | | | | | 1.133 | 0 |
| 0522 | | | | | 1.699 | 0 |
| 0524 | | | | | 2.266 | 0 |
| 0525.4 | | | 245.5 | 17.0 | | |
| 0525.8 | | | 250 | 17.0 | | |
| 0527 | 77 | Full Throttle | 250 | 17.0 | 3.115 | .038 S |
| 0528 | | | 247 | 16.6 | 3.395 | .056 S |
| 0529 | | | 243.5 | 16.1 | 3.669 | .059 S |
| 0530 | | | | 15.8 | 3.937 | .052 S |
| 0532 | | | | 15.6 | 4.460 | .034 S |
| 0534 | | | | 15.5 | 4.978 | .015 S |
| 0534.9 | | | 243.5 | | 5.205 | .007 S |
| 0535.2 | | | 245 | | 5.285 | .005 S |
| 0536 | | | | | 5.495 | 0 |
| 0538 | | | | | 6.012 | .005 P |
| 0540 | | | | 15.5 | 6.529 | .010 P |
| 0541 | 60 | 20–40–60 Full Ahead | | 15.5 | 6.787 | .013 P |
| 0542.5 | 20 | Slow | 245 | 14.0 | 7.165 | .017 P |
| 0543.5 | 20 | | 250 | 12.15 | 7.375 | .010 P |
| 0545 | 0 | Stop | | 9.66 | 7.645 | .008 S |
| 0545.8 | | | 250 | 8.53 | 7.770 | .017 S |
| 0546.2 | | | 251 | 8.1 | 7.825 | .022 S |
| 0547.5 | | | 258.5 | 7.1 | 7.984 | .044 S |
| 0547.7 | | | 260 | 7.0 | 8.010 | .050 S |
| 0548 | 20 | Slow Astern | 264.5 † | 6.76 | 8.040 | .060 S |
| 0548.25 | 0 | Stop | 270 | 6.59 | 8.067 | .071 S |
| 0548.5 | 60 | Full Astern, Jingle | 279 | 6.45 | 8.089 | .084 S |
| 0548.75 | 65 | Full Astern, Jingle | 286.5 | 6.0 | 8.110 | .098 S |
| 0549 | 65 | | 292.5 | 5.5 | 8.127 | .115 S |
| 0549.25 | 65 | | 297 | 4.96 | 8.140 | .130 S |
| 0549.5 | 0 | Stop | 301 | 4.50 | 8.153 | .147 S |

Speed Relationship Used

| RPM | Speed Used in Calculation |
| --- | --- |
| 84 | 17.0 knots |
| 77 | 15.5 |
| 60 | 12.0 |
| 20 | 4.0 |

* Course Recorder time adjusted to Engine Room time by subtracting 1.0 minute. Course Recorder headings in Column 4 adjusted by adding 1½° to headings below 270° and subtracting 1½° from headings above 270° to correct misalignment of course recorder paper.

† NOTE: The heading 264.5 should read 261½.

■ This chart shows, as is common knowledge, that a change of engine movement does not immediately put a ship at the speed requested but that time is necessary in order to decelerate. It also shows that in the crucial last four minutes the MATHEW LUCKENBACH reduced her speed from 9.6 knots (approximately 1000 feet per minute) by only 4.1 knots and at the time of collision was proceeding at the rate of 5½ knots.

It has been argued that we should accept the testimony of experienced men (the captain and pilot) who were familiar with the MATHEW LUCKENBACH and reject the ivory tower professor approach of Suarez.

■ We are persuaded that the speed of the MATHEW LUCKENBACH in the crucial minutes before collision can justly be resolved by accepting the testimony of the expert, Suarez, and rejecting the testimony of the interested witnesses of the MATHEW LUCKENBACH, her master and pilot. We accept the testimony of Suarez because of his expertise and the use by him of the MATHEW LUCKENBACH'S own records (her Engine Room Bell Book, her course recorder, and the testimony of her master as to the speed at certain engine orders); and reject the testimony of the master and pilot because of their obvious interest and because it conflicts with other acceptable evidence. We find as an additional fact that they each lied with respect to other material facts in issue, viz., the plotting and observations on the MATHEW LUCKENBACH'S radar. Infra, p. 680.

To this must be added or subtracted an appraisal of the testimony of the MATHEW LUCKENBACH'S helmsmen, Bauer and Barbee. Neither of these witnesses impressed us and we find unexplained inconsistencies in their testimony too. In fact they each seemed to disagree with the master as to the behavior of the ship when her speed was 14 knots and 4 knots. We get the impression that their testimony was tailored to meet the contrived defense.

In addition to the speed as shown by Suarez, the FRANCISVILLE argues that the speed of 5½ knots at collision time is further corroborated by the angle of collision; photographs of the damaged portions of the ships; by the various times, positions and speed of the following vessels, KAMPERDYK and VASAHOLM, and by the homely characterization of the events in the Bridge Bell Book by the deck officer, viz., "0550 Rammed Norwegian vessel."

## Angle of Collision

■ This issue assumed vital importance at trial and in the argument of counsel since it was of fundamental importance as an assumed fact for the experts on both sides who expressed opinions as to the speed based upon the resulting damage to the hulls.

The FRANCISVILLE claims that the angle was substantially 90°; the MATHEW LUCKENBACH that it was 53½°.

Fortunately important facts are a matter of mechanical recordings and are dispositive of this issue. The FRANCISVILLE had a gyro compass repeater whose electricity supply was shorted by the collision causing the repeater to stop at 026½°. The MATHEW LUCKENBACH had a log which continuously recorded her compass headings. Between 0549 and 0550 course recorder time MATHEW LUCKENBACH'S heading changed from 260° to 294°, i. e., she turned to starboard at the rate of 34° per minute.

From these decisive facts, as counsel repeatedly characterized them, opposite conclusions have been drawn and forcibly argued. The FRANCISVILLE to the effect that to turn so rapidly in so little time the MATHEW LUCKENBACH must necessarily have had more than mere steerageway (4 knots), and must have been barging ahead at six to seven knots; therefore, the turn to starboard was *before* the collision.

The MATHEW LUCKENBACH claims that they prove conclusively that her heading was 260° at the time of collision and the starboard turn of 34° can only be ex-

plained by the FRANCISVILLE travelling at 10.9 knots and impaling herself on the MATHEW LUCKENBACH'S bow when she was dead in the water. Therefore, the turn to starboard was *after* the collision.

If we accept the FRANCISVILLE'S contention, the collision angle had to be approximately 90° and the MATHEW LUCKENBACH'S heading had to be about 296° (026½° + 180° + 90° = 296½°). If we accept the MATHEW LUCKENBACH'S contention that the collision angle was 53½° her heading had to be 260° (053½° + 180° + 26½° = 260°).

Both Captain Hodson of the MATHEW LUCKENBACH and her expert, Minorsky, testified that there was no power within the MATHEW LUCKENBACH at the time to permit her to turn at such a rate (the MATHEW LUCKENBACH claims that the rate of swing was 46° per minute) and the force had to come from without. This was based on the assumption that she was dead in the water.

An analysis of the course recorder record plus the common agreement that it contained a 1½° error, clearly shows that the swing to starboard was not at the rate of 46° but 34° per minute. The 46° per minute argued by the MATHEW LUCKENBACH comes from a misunderstanding of what the course recorder shows. In moving from a reading of 260° to a reading of 271.5° the pen of the course recorder did not move 11.5° but only 8.5°. This because of the agreed error of 1½°. So, correcting the readings, 260° becomes 261.5° and the 271.5° becomes 270°, the difference therefore is 8.5°. A swing of 8.5° in 15 seconds if multiplied by four gives a 34° swing per minute.

More accurately interpreted, the heading changes from 261.5° to 292.5° were at the rate of 34° per minute for the first 30 seconds, 32° for the next 15 seconds and 24° for the last 15 seconds, or a collision heading of 292.5° at 0550,

the bridge collision time. Even the MATHEW LUCKENBACH'S expert, Minorsky, admitted that if her speed was between 6.5 and 7 knots she could swing at 35° per minute.

We are convinced that when read in conjunction with our finding that the MATHEW LUCKENBACH was proceeding at collision at 5½ knots, the mechanical recordings establish the collision angle to have been approximately 90° and not 53½°. Independently of any expert opinion we are fortified in this conclusion by the testimony of the principal bridge witnesses who approximated the same angle. All of these men were eye witnesses to the collision and drew diagrams for the Coast Guard two days afterwards.[4] The Coast Guard testimony of these men (the pilot, the captain and the watch officer) is important because on trial they changed it and we are convinced that they changed the angle to accommodate it to the theory of the MATHEW LUCKENBACH. The angle had to be changed to equate it with the MATHEW LUCKENBACH'S claim on trial that it was the FRANCISVILLE'S hard left turn at the last moment that brought the two ships into collision and to negate their prior testimony that the MATHEW LUCKENBACH had made a hard right turn.

In arriving at the finding of a 90° collision angle we attach little importance to the testimony of the surveyors who saw the damaged vessels shortly after the collision. Barrie, the FRANCISVILLE'S surveyor, gave his opinion of the collision angle as 80° to 90° and the speed of the MATHEW LUCKENBACH as 7 to 8 knots. Bagger, the surveyor for the MATHEW LUCKENBACH, gave his opinion of the angle as 68.5° and gave no opinion as to the speed. We give no credence to these opinions since we are satisfied that neither by education nor experience are they qualified to give such opinions.

4. The lookout of the MATHEW LUCKENBACH, Clemente, drew a diagram at trial which depicted an angle that was substantially smaller than 90° but we doubt he was in a position to see the collision.

## Damage Experts

However, there were a number of well qualified experts who testified and based their opinions on assumed facts and photographs of the damaged hulls and repair bills.

Mr. Larson, a physicist, called on behalf of the FRANCISVILLE, opined that the collision angle was 90°. In answer to a hypothetical question in which he was asked to assume a right angle collision, he stated that the MATHEW LUCKENBACH'S speed was 5.2 knots at the moment of impact. His calculation was based on the application of Newton's Second Law of Motion with a constant force of interaction between the vessels during collision. He also testified to the amount of kinetic energy lost in the collision assuming it was a right angle collision, and estimated that 29.5 million foot pounds of kinetic energy were lost and attributed 1.12 million foot pounds to the FRANCISVILLE and the balance to the MATHEW LUCKENBACH. From these figures he concluded, using the equation of the MATHEW LUCKENBACH'S expert, Minorsky, that the MATHEW LUCKENBACH'S speed at collision must have been 5.2 knots in order to furnish the balance of the kinetic energy lost.

The MATHEW LUCKENBACH'S claim of a 53½° angle based upon the claimed respective headings of 260° and 26½° is confirmed, she argues, by the same photographs and repair bills and the testimony of her two experts, McMullen and Minorsky, and further that the angle at maximum penetration was not more than 65°.

Although we respect the judgment and integrity of these experts we are unable to accept the expert opinions of the MATHEW LUCKENBACH witnesses because we find that their opinions were based on assumed facts which are contrary to the facts we have found. For example, McMullen assumed a heading of 260°; Minorsky was not asked to assume a right angle collision but on cross-examination admitted that if that was a fact the MATHEW LUCKENBACH'S speed must have been five knots. Although we must confess an inability to fully understand all that these experts said when they spoke in the realm of higher mathematics it is clear to us that whatever the speed of the MATHEW LUCKENBACH was it had to have a definite relation to the angle of collision. Even Minorsky admitted that if the collision angle was 90° "there could have been penetration of the FRANCISVILLE of almost probably the order of magnitude as was found in the collision." Having found the angle of collision to be substantially 90° we need not dwell on the testimony of McMullen and Minorsky who were asked to assume much smaller angles.

Experts aside, the photographs themselves, to us as trier of the facts, are very vivid evidence of the probable speed of the MATHEW LUCKENBACH. The damage to the FRANCISVILLE could not have been done by the MATHEW LUCKENBACH being dead in the water.

There was some further proof offered as to the speed of the MATHEW LUCKENBACH by an analysis of the speed of the two following vessels, the KAMPERDYK and the VASAHOLM, who it is argued maintained their speeds of approximately 8 to 10 knots behind the MATHEW LUCKENBACH without gaining on her. However, this proof was of little help since there were significant differences in recorded times and the testimony related to only approximate distances. The only significant fact is that they too proceeded at speeds that were hardly moderate in fog.

Probably the most telling evidence negating the claim of being dead in the water is the spontaneous entry by a bridge officer. Here the watch officer of the MATHEW LUCKENBACH made the entry in the Bridge Bell Book "0550 Rammed Norwegian vessel #3 hatch stb." This entry was approved in writing by the master and the chief officer when it was reentered into the Smooth Log. Cf. The Georgian, 76 F.2d 550, 551 (5th Cir., 1935).

## Conclusion Re Speed

The statutory standard for the rate of speed in fog is found in Article 16 of the Inland Rules (33 U.S.C. § 192). It is: "Every vessel shall, in a fog * * * go at a moderate speed, having careful regard to the existing circumstances and conditions."

■ Although decisional law as to what is moderate speed under the facts and circumstances there reported is of assistance it is not controlling, being "but glosses upon the basic rule." Most cases, however, seem to agree that in dense fog the speed should be reduced to the lowest point consistent with good steerageway. See, e. g., The Martello, 153 U.S. 64, 14 S.Ct. 723, 38 L.Ed. 637 (1894). In fact, proctors for the MATHEW LUCKENBACH frankly state: "There is no real issue of law here. We do not disagree with The Martello, * * * in saying that 'it is not unreasonable to require that she reduce her speed to the lowest point consistent with good steerageway' * * *"

■ Some courts have applied the Rule of Sight, viz., to be able to stop within the vessel's share of the visibility. O/Y Finlayson-Forssa A/B v. Pan Atlantic S.S. Corp., 259 F.2d 11, 22 (5th Cir., 1958); The Chicago-Silver Palm, 94 F.2d 754 (9th Cir., 1937); The Manchioneal, 243 F. 801 (2d Cir., 1917). Whether such rule is applicable in this circuit has been questioned by Judge Learned Hand sitting as a district judge in Oil Transfer Corp. v. Westchester Ferry Corp., 173 F.Supp. 637, 639 (S.D. N.Y., 1958). Perhaps, too, the decisional law in this circuit is even stricter than either the Bare Steerageway Rule or the Rule of Sight for in Afran Transport Co. v. The Bergechief, 274 F.2d 469, 473 (2d Cir., 1960), the BERGECHIEF was condemned for maintaining steerageway in dense fog in the absence of a current of substantial force. In any event we are content to follow the rule ordained by Congress which in the final analysis is a relative one and depends on the peculiar circumstances of each case. Polarus Steamship Co. v. The T/S Sandefjord, 236 F.2d 270, 272 (2d Cir., 1956).

■ Having found the speed of the MATHEW LUCKENBACH at collision time to be 5½ knots and her speed one minute before 7 knots, and four minutes before 9.6, we are satisfied that under the facts and conditions here existing, viz., dense fog, knowledge for at least 15 minutes of the approaching and speeding FRANCISVILLE, and knowledge that she had not made her expected turn to the right at 17 foot spot buoy but was proceeding northeast at undiminished speed to buoy 3HC where she would have to make her turn for buoy BB, and that their respective course lines had to cross, we hold and find the MATHEW LUCKENBACH to have been in violation of Article 16 because her speed under those conditions and circumstances was not moderate. To this must be added the circumstances and conditions of her radar observations and interpretations now discussed.

### Radar

Perhaps the most significant fault of the MATHEW LUCKENBACH, aside from her immoderate speed, was her ignorant disregard of the radar information she had for almost 15 minutes before the collision. This fault has been compounded on trial by a bold contempt for the truth and a contrived story by the master and pilot of the MATHEW LUCKENBACH to the effect that they knew the course and speed of the FRANCISVILLE from the time they first observed her at the Buzzards Bay Lightship eight miles distant and continued to know her course and speed right up to the last minute.

Before the Coast Guard, the master, Hodson, swore he could not keep a continuous plot of the FRANCISVILLE because of his pilot's changes of course and of speed. He did not even see the FRANCISVILLE change her course at buoy 3HC. Pilot Towne of the MATHEW LUCKENBACH told the Coast Guard he was relying on the master for such vital information—the age-old story of the blind leading the blind.

■ On trial the master swore that he was using a cursor as did the pilot who testified he saw the FRANCISVILLE take her turn to the right at buoy 3HC. At trial they testified to using the cursor and making plots by grease marks (no one attempted to make a vector analysis) and thus kept informed of the FRANCISVILLE'S course and speed. We find this testimony unworthy of belief and reject it and find as a fact that the navigating officer and pilot of the MATHEW LUCKENBACH did not use her radar intelligently or with anything like what good seamanship required; and that as a result of the misinterpretation and incompetent use she blindly changed her headings and barged ahead on a collision course. In short the course alterations based on inadequate radar information, or worse, negligent interpretation, instead of avoiding the collision, insured it.

■ We agree with the proctors for the MATHEW LUCKENBACH that "radar and the information gained from its use are 'circumstances and conditions' for which the trier of the facts must have 'careful regard' in considering whether the speed was 'moderate.'" They in turn agree with the proctors for the FRANCISVILLE that "radar is not a substitute for moderate speed nor does it serve as an excuse for noncompliance with the rules." O/Y Finlayson v. S.S. Antinous, 156 F.Supp. 414, 420 (E.D.La., 1957) reversed on other grounds, 259 F. 2d 11 (5th Cir., 1958) and that "the possession of radar is not a good excuse for defying the collision regulations or for proceeding at an immoderate rate of speed in fog." The Miguel de Larrinaga (1956), 2 Lloyd's Rep. 530, 538; and that "radar is an aid not a substitute for prudent seamanship." Wood v. United States, 125 F.Supp. 42, 51 (S.D. N.Y., 1954).

Mr. Justice Willmer's statement in The Anna Salen (1954), 1 Lloyd's List L.R. 475, 488, is also of telling importance. He there stated: "* * * These scientific installations and particularly radar, are potentially most valuable instruments for increasing safety at sea; but they only remain valuable if they are intelligently used, and if officers responsible for working them work them and interpret them with intelligence. That is only another way, I think, of saying a good lookout must be maintained. A good lookout involves not only a visual lookout, and not only the use of the ears, but also involves the intelligent interpretation of the data received by way of these various scientific instruments." The court of appeals' prophecy in Polarus Steamship Co., Inc. v. T/S Sandefjord, 236 F.2d 270 (2d Cir., 1956) is forcefully applicable here: "Had successive observations been plotted to determine the course and speed of the POLARUSOIL [FRANCISVILLE] which was plainly visible on the radar screen when about seven [eight] miles away, the ships would probably have passed one another in safety. But the master of the SANDEFJORD [MATHEW LUCKENBACH] made no such calculations; he merely guessed that the POLARUSOIL [FRANCISVILLE] was steering a course parallel to the coastline [to far north] and moving [would move] to the left of the SANDEFJORD [MATHEW LUCKENBACH]. While a matter of conjecture, it seems not unlikely that the SANDEFJORD [MATHEW LUCKENBACH] would have proceeded more cautiously had she not been equipped with radar, which, under the circumstances, gave a false sense of security." Id. at 271.

The circumstances and conditions here disclosed are that instead of being able to "see through the fog" with the aid of her radar and act accordingly, the MATHEW LUCKENBACH kept assuming, without any scientific basis whatsoever, that she was giving the FRANCISVILLE more room for a port to port passing by blindly changing course and not going astern to take off her way. Had she made a plot and known the course and speed of the FRANCISVILLE she would not have continued with her immoderate speed and the collision would have been avoided. This circuit has condemned as a fault similar action with the advice that if the navigator does not have time to make a

plot *he should stop and make the time for a plot.* Afran Transport Co. v. The Bergechief, supra.

We are satisfied that those on the bridge of the MATHEW LUCKENBACH who acknowledged seeing the FRANCISVILLE'S pip for at least 15 minutes were incompetent to interpret the radar observations and were using the radar scope as if it were some kind of a magic glass without any understanding of its marvelous scientific information. This is hardly surprising since the pilot admitted at the Coast Guard hearing that he had no training in radar interpretation and hardly ever looked at one, and the master himself never took any formal training although he did receive instructions on two trips to Philadelphia. With that background they each had the effrontery to swear at trial that they were using the cursor in making plots and knew at all times the course and speed of the FRANCISVILLE.

### Narrow Channel Argument

One of the MATHEW LUCKENBACH'S principal contentions is that the area of Buzzard's Bay from buoy BB to 3HC is a Narrow Channel, and even if it is not, good seamanship demanded that each vessel keep to her starboard side of the fairway and pass port to port. Conscious of this obligation and seeing the FRANCISVILLE going much farther northeast toward 3HC than was customary for eastbound vessels, she kept more and more to her starboard to give the FRANCISVILLE more room and more time to make her turn for the Canal, and despite this maneuver the FRANCISVILLE at the last minute recklessly made her sharp left turn from course 065° and impaled herself on the MATHEW LUCKENBACH'S bow who had been doing everything to get out of her way.

Whether the area in question is a Narrow Channel or not, we hold, is a mixed question of fact and law.

Article 25 of the Inland Rules (33 U.S. C. § 210) provides: "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

In The No. 4, 161 F. 847, 850 (2d Cir., 1908) Judge Ward's definition of Narrow Channel is: "The *ratio decidendi* of the latter case is that channels within the rule are bodies of water navigated up and down in opposite directions, and that therefore harbor waters with piers on each side, where the necessities of commerce require navigation in every conceivable direction, up and down, across, and up and down between piers on the same side, cannot be considered as narrow channels."

All authorities seem to agree that you do not look to the mere physical dimensions of the area in order to determine whether it is a Narrow Channel but rather the character of navigating use to which the water is put. See Griffin, On Collision, pp. 88 et seq. Of course, the area is one of the factors.

While there is no heavy cross traffic here there is in the summer time considerable small craft crossing in all different directions. A look at the chart will clearly show it is not a Narrow Channel. It varies from 1¼ miles to 6 miles wide over an irregular shape. Buoys BB and 3HC, the important buoys for setting courses east and west (65° and 245°) can be passed on either side with plenty of water. The other buoys mark shoals only. The MATHEW LUCKENBACH argues that the mouth of the channel is between buoys 3HC and 2A, a distance of .73 miles. There is no substance to this argument because 3HC could not be the northern boundary. There is an equal amount of water north of 3HC as there is southeast to buoy 2A and even if it were the northern boundary the MATHEW LUCKENBACH'S course of 245° from buoy BB would put her on the wrong side of her self-made narrow channel.

Based upon the conflicting evidence of the coast pilots plus the suggested courses in Eldridge Tide and Pilot Book, 1959, and the largeness of the area, the small craft crossings and the amplitude of the water of sufficient depth we

are persuaded that the character of navigating use to which the water is put is such that it is not and could not be defined as a Narrow Channel and accordingly there is no obligation to pass port to port, although all are agreed that good seamanship requires everyone to keep to the right but that is modified by the phrase "when it is safe and practicable."

■ But whether the FRANCISVILLE could have hauled east after passing the 17 foot spot buoy for 2A and 2B and there set her course for BB we hold that under the circumstances here disclosed, i. e., heavy fog, it was safer for the FRANCISVILLE to continue northeast and turn at 3HC after a visual fix rather than run the risk of the shoal waters at buoys 2A and 2B. But the failure to do the latter was not the proximate cause of the collision. Those on the bridge of the MATHEW LUCKENBACH knew she had not turned from the 17 foot spot buoy for 2A but was going northeast to 3HC for a turn. The pilot knew this and told the Coast Guard: "It looks like he's working to the north'ard, if he comes much further north'ard, why, we can go to the north'ard of Hen and Chickens Buoy and run 17 foot spot buoy a couple points abaft the beam and haul out for Buzzard's Light Vessel."

At most there was a conflict in the evidence on how an eastbound ship heads for buoy BB. We find that there was no custom and that it was not unusual to take a visual fix on 3HC, fog or no fog. If the MATHEW LUCKENBACH assumed that the FRANCISVILLE would get back on her own side of the "channel" she is to be condemned in the words of Judge Learned Hand: "Masters who choose to divine the purposes of other vessels and keep on, may avoid the charge of overcaution, but they take their chances. If they escape, well and good; if they fail, their owners pay." A. H. Bull S.S. Co. v. United States, 34 F.2d 614, 616 (2d Cir., 1929).

Here the MATHEW LUCKENBACH barged ahead when she knew the FRANCISVILLE was heading to turn on the same buoy (3HC) for which she was heading. Instead of making more room for a port to port passing, every degree the MATHEW LUCKENBACH ignorantly swung to starboard brought her closer to the 065° course line of the FRANCISVILLE.

There was testimony by a number of witnesses relative to the exact place of collision, and of Bakken and the diver who found "the" anchor. These witnesses indicated on charts where the collision took place and where "the" anchor was found. The Coast Guard in its official report of assistance fixed the position of the anchored FRANCISVILLE after the collision. Boshoff, the first officer of the KAMPERDYK, who saw the two pips of the FRANCISVILLE and the MATHEW LUCKENBACH merge on his radar screen, identified the position on a chart at trial based upon his recollection. Towne, the pilot of the MATHEW LUCKENBACH, and Steiro, the FRANCISVILLE'S watch officer, each identified a position, also based on recollection. Athough this is an exact science no two positions are the same and they vary by considerable distances. If, as the proctors seem to agree, the position of the anchor is at best the closest position to where the collision occurred that position should be accepted. There was no direct proof however, that it was the anchor of the FRANCISVILLE that was found although there is a fair inference that it was since Bakken was hired and paid by the FRANCISVILLE'S underwriters. But the anchor was not dropped at the instant of collision but a minute or so later.

However, we are not satisfied that Bakken, an unusually credible witness, was as accurate as the science requires because if we accept his position it is too far south of the 065° course of the FRANCISVILLE before her sharp turn left. We find it hard to accept the Coast Guard position because Bakken, using that position, was unable to find the anchor, nor can we accept the testimony of Boshoff, Towne and Steiro because none of their positions was determined with any degree of scientific accuracy. The sum to-

tal of all the evidence on this issue leaves undetermined the exact location, but this is not surprising nor is it too important. At the time of collision in dense fog no one on either ship bothered to fix the position. The only importance of the exact location was to prove that FRANCISVILLE was farther north than she should have been for a port to port passing in connection with the MATHEW LUCKENBACH'S argument that she was well over the wrong side of the fairway in a Narrow Channel. This argument has been disposed of.

### Major-Minor Fault

Having found the MATHEW LUCKENBACH guilty of statutory fault in her immoderate speed in dense fog and guilty of negligence in her navigation because of her incompetent interpretation of her radar we must now, pursuant to the pretrial order, determine if she is entitled to the benefit of the major-minor fault rule.[5]

 The cases are legion to the effect that the gross fault of one vessel does not absolve the other from the use of such precautions as good judgment and accomplished seamanship require. The Albert Dumois, 177 U.S. 240, 253–254, 20 S.Ct. 595, 44 L.Ed. 751 (1900), and cases cited in Griffin on Collision, pages 505 et seq., and Gilmore & Black, The Law of Admiralty, pages 404 et seq. Even those cases which hold that where one vessel is grossly at fault the other's must be viewed with lenity still condemn a plain fault as non-excusable. Federal Insurance Co. v. s/s Royalton, 312 F.2d 671 (6th Cir., 1/25/63; O/Y Finlayson-Forssa A/B v. The Pan Atlantic S. S. Corp., supra; Tank Barge Hygrade, Inc. v. The Tug Gatco New Jersey, 250 F.2d 485–487 (3rd Cir., 1958); Tidewater Assoc. Oil Co. v. The Syosset, et al., 203 F.2d 264, 267 (3rd Cir., 1952); The San Simeon, 63 F.2d 798, 800 (2d Cir., 1933).

 In this case the faults of the MATHEW LUCKENBACH were not minor or technical but each substantially *contributed* to the collision.

The MATHEW LUCKENBACH complains of the injustice of the 50/50 apportionment of damages that we have cast on her because most of the maritime nations of the world have agreed by convention on apportionment of damages in collision cases. No matter what our personal opinion is as to the proposed legislation now pending in Congress, S. 2313, 87th Cong., 2d Sess. (1962) we, as a puisne judge, are not at liberty to change the often reiterated rule of the Supreme Court. See Halcyon Lines v. Haenn Ship Corp., 342 U.S. 282, 284, 72 S.Ct. 277, 96 L.Ed. 318 (1952). Cf. Judge Hand's appropriate comment in Oriental Trading & Transport Co v. Gulf Oil Corp., 173 F.2d 108, 111 (2d Cir., 1949) cert. denied Gulf Oil Corp. v. M/V The John A. Brown, 337 U.S. 919, 69 S.Ct. 1162, 93 L.Ed. 1728: "we have no power to divest ourselves of this vestigial relic; we can only go so far as to close our eyes to doubtful delinquencies." Here the faults of the MATHEW LUCKENBACH were not doubtful delinquencies and we cannot in conscience close our eyes to overt faults but must, and do, impose upon the MATHEW LUCKENBACH half the damages resulting from the collision.

 These findings of fault against the MATHEW LUCKENBACH resolve the only remaining issue in the libel brought by the cargo interest, viz., The East Asiatic Co., Ltd. It, too, is entitled to a decree against the MATHEW LUCKENBACH. United States v. Atlantic Mut. Ins. Co., 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed. 907 (1952); The Chattahoochee, 173 U.S.

---

5. An unhappy phrase, vague and unreliable according to Gilmore & Black, The Law of Admiralty, p. 403; also sometimes called the "gross fault" rule. Judge Clark has said: "That rule is not particularly rational itself, it is only a rather cumbersome device for avoiding some of the consequences of a lack in our law of a rule of proportional division of loss according to degree of fault * * * but it should be recognized for what it is, and its lifting-by-one's-bootstraps qualities duly appraised." (Dissenting opinion, Harbor Oil Transport Co. v. The Plattsburgh Socony, 151 F.2d 708, 710 (2d Cir., 1945).)

540, 19 S.Ct. 491, 43 L.Ed. 801 (1899); The Atlas, 93 U.S. 302, 23 L.Ed. 863 (1876).

Let this opinion stand for findings of fact and conclusions of law pursuant to Admiralty Rule 46½.

Settle decrees accordingly.