**SPORTSMEN'S ENTERPRISES, INC., and Two Twenty-Eight Terminal Services, Inc., Plaintiffs,**

**and**

**Tamak Transportation Corporation, Intervenor,**

**v.**

**UNION BARGE LINE CORPORATION, Defendant.**

**No. GC 6614.**

United States District Court
N. D. Mississippi,
Greenville Division.

Dec. 11, 1969.

Douglas C. Wynn, Frank Thackston, Jr., of Lake, Tindall & Hunger, Greenville, Miss., for plaintiffs.

James L. Robertson, of Campbell, De-Long, Keady & Robertson, Greenville, Miss., Michael D. O'Keefe, St. Louis, Mo., for intervening plaintiffs.

George A. Frilot, III, of Lemle, Kelleher, Kohlmeyer, Matthews & Schumach-

er, New Orleans, La., Clayton J. Swank, III, of Robertshaw, Merideth & Swank, Greenville, Miss., for defendant.

## MEMORANDUM OPINION

ORMA R. SMITH, District Judge.

This case is before the Court for decision on pre-trial briefs, evidence introduced at the trial of the case before the Court, without a jury, and proposed findings of fact and conclusions of law submitted to the Court.

This is a suit brought by plaintiffs, Sportsmen's Enterprises, Inc. and Two Twenty-Eight Terminal Services, Inc., owner and bareboat charterer respectively of the sunken Towboat SOUTH-EASTERN, to recover of defendant, Union Barge Line Corporation, owner of the M/V NAVIGATOR, the value of the tugboat, alleged to be $85,935.46, and for the value of certain tools, equipment, supplies, fuel, lubricants, groceries, the personal belongings of the crew which were aboard the SOUTHEASTERN, at the time of its sinking on August 17, 1964, and for other expenses in connection with attempts to locate and raise the towboat which was never recovered. The suit is based on the allegation that the sinking of the SOUTH-EASTERN was occasioned by a collision between the tows of the two vessels, proximately resulting from the negligent manner in which the NAVIGATOR and its tow was being operated at the time of the collision.

The tow of the SOUTHEASTERN consisted of a single barge, the ALAMO-1300, the property of the intervening plaintiff, Tamak Transportation Corporation. The intervening plaintiff asserts a claim for damages to the ALA-MO-1300 against both plaintiffs and defendant in the sum of $6,872.76, consisting of cost of repairing the barge in the amount of $4,372.76 and loss of use of the barge in the sum of $2,500.00.

The case is before the Court on questions of both liability and damages. After a full consideration of the evidence, applicable law, and the entire record herein, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### I.

Plaintiffs, Sportsmen's Enterprises, Inc. and Two Twenty-Eight Terminal Services, Inc., were, at the times pertinent herein, corporations organized under the laws of the State of Louisiana, and were the owner and bareboat charterer respectively of the SOUTHEAST-ERN, a documented vessel of the United States, Official Number 270639.

### II.

Intervening plaintiff, Tamak Transportation Corporation, was, at the times pertinent herein, a corporation organized under the laws of the State of Arkansas, and was the bareboat charterer of the Barge ALAMO-1300.

### III.

Defendant, Union Barge Line Corporation, was, at the times pertinent herein, a corporation domiciled and doing business in Pittsburgh, Pennsylvania, and was the owner and operator of the Towboat NAVIGATOR.

### IV.

On August 17, 1964, the SOUTH-EASTERN was proceeding upbound in the Mississippi River pushing a single barge, Barge ALAMO-1300, and was approaching the vicinity of Reynolds Light. On the 1963 charts prepared by the U. S. Corps of Engineers, Reynolds Light is located at Mile 527.6 above the head of the passes on the lower Mississippi River, just below Greenville, Mississippi. The evidence reflects that the SOUTH-EASTERN was a push-boat having dimensions of 60 feet in length, 20 feet in breadth and 5 feet in depth. Her horsepower, which was developed by three 6/110 GM diesel engines, was 660. She was a triple screw vessel, wheelhouse controlled, viz., her rudders and throttles were operated by the pilot on

watch in the wheelhouse. The barge in tow of the SOUTHEASTERN, Barge ALAMO-1300, was a chemical barge containing six cylindrical tanks laden with propane. The barge was 195 feet in length, 50 feet in breadth and 12 feet in depth. The evidence is uncontradicted that the freeboard of Barge ALAMO-1300 was approximately four feet. The freeboard of the SOUTHEASTERN was between six and nine inches.

### V.

As the SOUTHEASTERN and the barge in tow approached Reynolds Light, Captain Charles Kenneth Murphy was at the helm. Captain Murphy had had experience as a towboat pilot for about 10 or 11 years but had never worked aboard a vessel of the horsepower or size of the NAVIGATOR. His experience had been aboard smaller boats such as the SOUTHEASTERN. He testified that when he reached Reynolds Light he observed the grounded tow of the OUACHITA which was located in the crossing between Reynolds Light and La-Grange Towhead Light and approximately abreast of Warfield Point. The tow was grounded on the Arkansas side of the channel and he observed 400 to 500 feet of clear channel to the east of the grounded tow. Captain Murphy had overheard radio communications indicating that the NAVIGATOR was holding up with her tow near Miller Bend Lower Light or in the vicinity of Mile 534.2 because the OUACHITA was believed to be blocking the channel. When Captain Murphy observed this was not the case, he contacted the NAVIGATOR by radio and advised that the channel was clear and the NAVIGATOR and her tow might proceed down-river.

### VI.

The NAVIGATOR is a large river towboat 192 feet in length, 52 feet in width, which draws approximately 8½ to 9 feet. She is powered by two diesel engines of 3200 horsepower each so that her total horsepower was 6400. She is a twin screw vessel and is likewise wheel-

house controlled. She is also equipped with Dravo kort-nozzles which are cylindrical shaped devices which fit around her propellers and rudders in order to provide better steering capability. The tow of the NAVIGATOR consisted of 26 barges made up so that the tow at its widest point was 174 feet and the overall length of the tow including the NAVIGATOR was 1107 feet. Barge BB-3, a flat deck steel barge laden with a cargo of rock or stone, was positioned at the port stern corner of the tow in a fashion so that the barge extended back along the port side of the NAVIGATOR and the after corner of the barge was some distance astern of the pilot-house.

### VII.

When the NAVIGATOR and her tow held up at Miller Bend Lower Light, Pilot Herman W. Carpenter was at the wheel. Captain Carpenter had been serving as a pilot on river towboats since 1931. He held a U. S. Coast Guard license qualifying him as a master on river vessels of all gross tons. He also held a first class pilot's license covering the Mississippi River from New Orleans, Louisiana to Cairo, Illinois and for the Ohio River from Cairo, Illinois to Jeffersonville, Indiana. He had held these licenses since 1938. His experience as a river boat pilot included considerable experience aboard large vessels such as the NAVIGATOR. Captain Carpenter stood watch aboard the NAVIGATOR from 12:00 noon to 6:00 p. m. He was relieved by the master of the vessel shortly before 6:00 p. m. on August 17, 1964, while the vessel was still holding up at Miller Bend Lower Light adjacent to the Mississippi shore.

### VIII.

The master of the NAVIGATOR was Captain Homer T. Payton, who had long experience on river towboats including large boats such as the NAVIGATOR. He has served as master of the vessel since the time she was commissioned in October 1961. His U. S. Coast Guard

licenses included a master's license for vessels of all gross tons and a first class pilot's license for the Mississippi River and most of its tributaries. He had held these licenses for approximately twenty-five years. When Captain Payton came to the wheelhouse, he knew, or was informed, that the OUACHITA had reported that she was blocking the channel just above Reynolds Light. However, shortly after reaching the pilothouse, Captain Payton received a radio communication from Captain Murphy of the SOUTHEASTERN advising there was sufficient clearance in the vicinity of the OUACHITA for the NAVIGATOR to proceed downriver. Accordingly, the two captains agreed they would check later on an agreement for passing. As the NAVIGATOR moved outriver, the downbound DOROTHY I. SOUTHERN, with two empty barges in tow, passed the NAVIGATOR and proceeded downriver. As the NAVIGATOR moved into position to follow some distance astern of the DOROTHY I. SOUTHERN, Captain Payton ascertained that the DOROTHY I. SOUTHERN had "sucked down", indicating the water was shallow along the black buoy line marking the channel. Captain Payton referred to the river charts in evidence and indicated this position to be a mile or more above the bend at Mile 530. When the NAVIGATOR and her tow reached that location, one of the barges faced up to the towboat, Barge UBL-334, which was laden with rock, rubbed bottom briefly. This incident, however, in no way affected the navigation of the NAVIGATOR or her tow.

### IX.

■ After passing the DOROTHY I. SOUTHERN on two whistles, or starboard-to-starboard, Captain Murphy on the SOUTHEASTERN again contacted Captain Payton on the NAVIGATOR, and proposed a one whistle, or port-to-port passing, to which Captain Payton agreed. Captain Murphy advised Captain Payton that he would move across the river to the revetment on the left descending bank, get over beyond the red buoys out of the way, and give the NAVIGATOR the entire river in which to make the passing. At this time both captains knew the size and extent of the other's tow.

### X.

The NAVIGATOR continued downriver with her pilot steering the black buoys. The head of the NAVIGATOR's tow remained near the black buoy line and her stern fell slightly to port as she executed the steer so that at the time of the collision, which ultimately resulted, the starboard stern corner of her tow was anywhere from 50 to 75 feet off the black buoy line which marked the Arkansas side of the channel. The SOUTHEASTERN on the other hand, crossed the channel from the Arkansas to the Mississippi side and moved over close to the revetment on the Mississippi shore. The SOUTHEASTERN held up for a time below a small "false point" or bulge in the shoreline but then began to move outriver at an angle, away from the revetment, and toward the tow of the NAVIGATOR. The SOUTHEASTERN continued this outriver maneuver until her tow became dangerously close to the tow of the downbound flotilla. At this point Captain Payton, recognizing there was the possibility of collision, increased the speed of the engines of the NAVIGATOR from slow bell to half ahead in an effort to move past the SOUTHEASTERN and her tow. This maneuver, however, was unavailing although the testimony of all witnesses demonstrates that the tows "lacked only 15 feet of clearing". Instead, the port stern corner of Barge BB-3 rubbed the port stern corner of Barge ALAMO-1300 for a distance of 5 to 6 feet.

### XI.

Captain Murphy pulled the SOUTHEASTERN over close to the revetment on the left descending or Mississippi bank of the river in an effort to get out of the channel and permit the downbound NAVIGATOR to have the entire channel as he had agreed to do. How-

ever, Captain Murphy did not hold up but continued to move slowly upstream until he came to a bend in the river bank where he made a movement to port to go into his crossing from the Mississippi to the Arkansas side of the channel above Mile 530. This port maneuver continued until Captain Murphy observed the tows were dangerously close, at which time he maneuvered to starboard in an effort to get out of the way and then made another maneuver to port just prior to the collision in an effort to bring the tows parallel as they rubbed together. After considering all of the evidence in the case, the Court finds that the tows rubbed together within the red buoys.

## XII.

The Court finds that Captain Murphy did not honor his agreement to stay out of the narrow channel in the bend at Mile 530 but instead maneuvered out-river and away from the Mississippi revetment, and the Court finds this to have been the sole cause of the contact between the tows of the SOUTHEAST-ERN and the NAVIGATOR.

## XIII.

The channel in the vicinity above mentioned at and below the bend at Mile 530 was narrow. There were varying estimates of the width of the channel, but the Court finds, on the basis of all the testimony, that the channel was in the vicinity of 300 to 400 feet wide although it may have been somewhat wider at various points. This channel width in relation to a tow of 26 barges was conceded by all of the witnesses to be a narrow channel. Captain Murphy's obligation with respect to the narrow channel was to hold up and let the NAV-IGATOR come on through.

## XIV.

The maneuvers of the SOUTHEAST-ERN as she moved away from the revetment were apparently predicated upon Captain Murphy's belief that the tow of the NAVIGATOR would *flank* rather than *steer* the bend at Mile 530. As a result, there was considerable testimony from both fact and expert witnesses concerning the safety of these two types of maneuvers. In steering the bend, a towboat would place the head of its tow close to the black buoys marking the right descending side of the channel and would continue to hold the head of the tow close to the buoys as the towboat negotiated the bend. This maneuver causes the stern of the towboat to fall slightly to port at the upper portion of the bend in the vicinity of the false point on the Mississippi shore so that the distance between the black buoys and the stern of the tow is approximately 50–75 feet. This interval increases slightly in the lower end of the bend. A flanking maneuver, on the other hand, requires that the head of the tow be placed over against or near the revetment on the Mississippi shore. The stern of the tow and the towboat are positioned close to the black buoy line so that the tow is laying cross the channel. The tow is permitted to move downriver with the current and thus negotiate the bend.

## XV.

The testimony of Captain Payton and Captain Carpenter clearly demonstrates that under the conditions which existed on the day of the casualty, they believed it was safe for the NAVIGATOR and its tow to steer the bend at Mile 530. Furthermore, they testified that the steering maneuver would have been safely accomplished without danger to the SOUTHEASTERN had the latter vessel remained close to the revetment and under the false point on the Mississippi shore in accordance with the agreement between the vessels. By contrast, the two pilots further explained that with the SOUTHEASTERN positioned against the revetment, a flanking maneuver would have surely caused collision since the head of the NAVIGATOR's tow would have been directed at or toward the SOUTHEASTERN.

## XVI.

Captain Murphy on the other hand believed it was customary to *flank* rather than *steer* the bend. It is his opinion that flanking the bend would have been the safest maneuver. There was a great deal of testimony from experienced river pilots introduced on the issue thus created. It is unnecessary to detail the testimony of the several witnesses on the issue, all of which is shown by the reporter's notes. On the basis of all the testimony, the Court finds as a fact that while personal preference may be involved in a pilot's choice of the manner in which the bend at Mile 530 is to be negotiated, the weight of the evidence establishes that the bend might be safely negotiated, under the conditions prevailing on August 17, 1964, by steering the bend as was done by the NAVIGATOR and her tow. This finding is bolstered by the fact that the NAVIGATOR was equipped with Dravo kort-nozzles which afforded greater steering capability.

## XVII.

Irrespective of the Court's finding with respect to the safety in steering as opposed to flanking the bend at Mile 530, Captain Murphy admitted that at the time the SOUTHEASTERN moved out and away from the Mississippi shore, he did not know whether the NAVIGATOR would *steer* or *flank* the bend. He merely assumed the latter maneuver would be employed. The Court finds from the evidence that if Captain Murphy had known the NAVIGATOR would *steer* rather than *flank* the bend he would not have moved the SOUTHEASTERN to port from under the false point on the Mississippi side of the river, bringing the SOUTHEASTERN closer to the NAVIGATOR. In acting upon his own assumption, which was not a correct one, Captain Murphy was grossly negligent in moving out from the revetment, and from under the false point.

## XVIII.

▉ The evidence reflects that the NAVIGATOR failed to sound a one whistle passing signal to confirm the radio agreement to pass the SOUTHEASTERN port-to-port. However, the masters of both vessels testified that there was never any doubt in either of their minds that the agreement was for a port-to-port passing and they navigated accordingly. In addition, neither the SOUTHEASTERN nor the NAVIGATOR sounded a danger signal prior to the contact between their tows. However, both captains agreed that the danger of collision existed only for a very brief period prior to actual contact inasmuch as it appeared the tow might clear up until the very last moment. They both agreed a danger signal would have contributed nothing toward avoiding collision. Furthermore, Captain Payton explained that the sounding of the danger signal by the NAVIGATOR would have only confused matters since that signal would have indicated the engines of the NAVIGATOR were placed full astern. Such a maneuver would clearly have caused a more serious collision, more serious damage and possibly loss of life. Under these special circumstances, the Court finds as a fact that the failure to sound a danger signal as well as the failure of the NAVIGATOR to sound a one whistle passing signal did not and could not have contributed to the impact between the tows.

## XIX.

Based upon all of the evidence adduced during the trial, the Court finds that the NAVIGATOR committed no faults which caused or contributed to the collision between its tow and that of the SOUTHEASTERN, but on the contrary, the Court finds as a fact that the sole cause of the collision was the fault and negligent navigation of the SOUTHEASTERN in the respects heretofore noted.

## XX.

Shortly after Barge BB-3 made contact with Barge ALAMO-1300, the starboard face wire extending between Barge ALAMO-1300 and the SOUTHEAST-

ERN parted. This caused the SOUTH-EASTERN to move sideways for a distance, responding to the tension asserted then by only the port face wire. Plaintiffs contend that the port stern corner of the NAVIGATOR's tow, the BB-3, after rubbing and coming into contact with the port stern corner of the ALAMO-1300, hit the SOUTHEASTERN, and that the force of this contact drove the SOUTHEASTERN through the water to her starboard. The greater weight of the evidence is to the contrary. The Court finds that the only contact between the vessels and their tows was between the port stern corners of the BB-3 and the ALAMO-1300, as hereinbefore mentioned.

### XXI.

■ After the collision or rubbing of the stern port corners of the tows the NAVIGATOR with its tow proceeded downriver at half ahead and after proceeding upstream approximately 200 feet the SOUTHEASTERN listed starboard and continued to do so until she rolled over on her starboard side and sank. After the collision of the tows the starboard face wire making the SOUTHEASTERN up to the ALAMO-1300 broke, forcing her starboard side further into the water. The port face wire also broke before the vessel sank.

### XXII.

Plaintiffs contend that the wave wash of the NAVIGATOR proximately contributed to the starboard listing of the SOUTHEASTERN and to her demise. It is not necessary to discuss in detail the many evidentiary features of the record relating to this issue. It is sufficient to say that the wheel wash of the NAVIGATOR passing through the kort-nozzles on that vessel as the rudders were directed to the starboard threw the propeller wash below the water's surface and to starboard away from the SOUTHEASTERN. The Court, therefore, finds that the wave wash of the NAVIGATOR was not a contributing or material factor in the sinking of the SOUTHEASTERN.

### XXIII.

■ In analyzing the evidence it is difficult to pin-point the factors contributing to the demise of the SOUTHEASTERN. The SOUTHEASTERN's freeboard was inadequate. Some of the witnesses placed the freeboard at six inches, others at from six to nine inches. In either case the Court holds that the evidence sustains the holding that the freeboard was inadequate. In addition, the vessel had no bull rail or wall around her deck. This enabled the water to come over the deck at the level of what is described as the "line-deck". There was no fabricated splash-board at the bottom of the engine room door, so that the bottom of the door was level with the line deck. A board, about six inches wide, had been placed in the bottom of the door to compensate for this inadequacy. This homemade substitute was not watertight and could not be as effective as a fabricated splash-board. The Court finds that the minimal freeboard and inadequate flash-board rendered the SOUTHEASTERN unsafe and unseaworthy and proximately contributed to the casualty.

### XXIV.

The SOUTHEASTERN took on fuel at Vicksburg to tank capacity of 6,000 or 6,500 gallons. This was done in the absence of Captain Murphy and while the vessel was faced up to the ALAMO-1300. The loading was performed under the supervision of the pilot, who had been serving as such only a short time and whose experience was limited. The evidence is not clear whether the face wires were adjusted at that time, but does show that no adjustment was made between Vicksburg and the point where the tragedy occurred. The reasonable inference from the evidence in the record is that the face wires were not properly adjusted, and the likelihood is that the maladjustment of the wires proxi-

mately contributed to the sinking of the SOUTHEASTERN.

### XXV.

The testimony reflects that there were three persons in the wheelhouse and one on the deck of the NAVIGATOR at the time of the casualty. These persons testified at the trial. The SOUTHEASTERN's crew, other than the master, consisted of the pilot, the engineer, and one deckhand at the time of the collision. The deckhand was in the wheelhouse with Captain Murphy. The deckhand was not called as a witness. The failure of plaintiffs to call him as a witness in the case is unexplained.

### XXVI.

The findings of the Court hereinbefore contained makes unnecessary a finding by the Court of the amount of damages sustained by plaintiffs as the result of the casualty aforesaid for the entry of a final judgment. However, since the Court heard evidence on the issue, the Court feels that it is appropriate for him to do so. There were two Marine surveyors and engineers who testified on this issue. The Marine surveyor and engineer testifying for plaintiffs was engaged in March 1963 to make a detailed survey of the SOUTHEASTERN when it was purchased in 1963 by plaintiffs for the sum of $56,000.00. The witness was not aware of the purchase price. In March 1963, after placing the vessel in first class condition, it was the opinion of this surveyor that the insured value would be $72,440.00, the replacement value $118,600.00, and a forced liquidation value $54,800.00. This vessel sank on November 26, 1963. It was recovered and repaired. The surveyor was called at that time to survey the vessel. He listed the repairs necessary to be made in order to return the vessel to its condition prior to the sinking, and prescribed certain betterments. After the vessel had been repaired, betterments made, and the vessel returned to service in February, 1964, the surveyor concluded the vessel was in a condition similar to that which existed when it was constructed in 1956. After inspecting the vessel in February, 1964, and at other times prior to the August 17, 1964, casualty when the vessel would be in port at Cairo, Illinois, it was the surveyor's opinion that the condition of the vessel, at the time of the demise on August 17, 1964, was similar to the condition which existed in February, 1964, less normal wear and tear. On the basis of his estimate of the replacement value of $118,600.00, and the vessel's serviceable life of thirty years, the surveyor gave the vessel a fair market value on August 17, 1964, of $83,023.00.

The other Marine surveyor and engineer who testified did so on behalf of defendant. His only contact with the SOUTHEASTERN came about because of his representation of underwriters who carried coverage on the SOUTHEASTERN at the time of her first sinking in 1963. This surveyor was engaged to oversee the repairs made to the SOUTHEASTERN at that time. The effect of his testimony is that the vessel was repaired at the time, but very little, if any, improvements or betterments were made. His testimony reflected that the original construction cost of the vessel was approximately $92,000.00, the present day replacement value $137,000.-00, and the replacement value on August 17, 1964, the sum of $110,000.00. He estimated the market value of the vessel in February 1964, when he came into contact with her, at $50,000.00 to $60,-000.00, and the market value on August 17, 1964, at $55,000.00.

A vessel of the type involved in the case sub judice does not have a market value as do stocks, or bonds, or even articles of commerce. The value is one of judgment. It is the Court's considered opinion that a fair market value of the SOUTHEASTERN at the time of the casualty was the sum of $65,000.00.

### XXVII.

The evidence as to the presence on board of the vessel at the time of the casualty of fuel, oil, drums, stores and

groceries, tools and equipment, and the fair value of each, is not sufficient for the Court to fix a fair market value on such items. The same is true as to clothing and personal effects said to have been lost in the sinking by members of the crew.

## XXVIII.

The Tamak Transportation Corporation [1] is the assignee of all of the assets and liabilities of Tamak Gas Products Company. The latter corporation, during the months of July and August, 1964, had the ALAMO-1300 under charter from Alamo Chemical Transportation Company for the sum of $7,672.00 per month, or approximately $250.00 per day. Tamak had an option to purchase the ALAMO-1300, and in such an event the rental payments under the charter would be credited against the purchase price. Tamak has exercised their option. Tamak, on or about July 17, 1964, entered into an agreement with plaintiff, Sportsmen's Enterprises, Inc., to tow the ALAMO-1300 from West Memphis, Arkansas, to Port Arthur, Texas, and return for the sum of $3,200.00. This operation was being performed at the time of the casualty herein. The ALAMO-1300 was damaged in the collision of the tows of the NAVIGATOR and SOUTHEASTERN. Tamak claims damage against one or both of the other parties for injuries to the barge and loss of time in returning the barge to its home port, West Memphis, Arkansas. The evidence shows that by reason of the collision of the vessels the barge was returned to Tamak nine days late. Tamak claims damages of $2,250.00 for loss of the use of the barge for the delay period.

The evidence reflects that the delay was necessarily occasioned by the sinking of the SOUTHEASTERN and the inability of Captain Murphy to arrange for another tugboat. The parties offered several witnesses on the issue of the cost of repairs to the ALAMO-1300.

One Marine surveyor estimated the cost of repairs to be approximately $2,000.00. The parties stipulated that another available expert would testify to the same effect, if called as a witness. There is evidence of a report of survey made for the underwriter of the barge showing the cost of repairs to be $4,277.00. There was some conflict in the testimony whether all of the damage shown on the last mentioned survey report resulted from the collision of the ALAMO-1300 with the tow of the NAVIGATOR. The witness testifying as to the $2,000.00 amount was unable to find items in controversy in the report of more than $325.00. It was stipulated at the trial that the president of a shipbuilding and repair company located at or near the place where the collision occurred, would testify that the reasonable cost of the repairs would be $3,415.20, a figure reached by him in consultation with one of the Marine surveyors present at the trial.

As the result of the casualty, Tamak was required to pay Union Carbide Company $333.31 to tow the ALAMO-1300 from Greenville, Mississippi, to West Memphis, Arkansas, and to expend $95.76 for the use of a Marine surveyor.

Tamak paid to Captain Murphy the sum of $733.25 and seeks to recover this amount, as a credit on the tow hire of $3,200.00 with Sportsmen's Enterprises, Inc. The record reflects that Tamak's dealings were really with the Murphy Towing Company, a partnership existing between one of the owners of plaintiff corporations and Captain Murphy.

The ALAMO-1300 was surveyed in July, 1964. The surveyor who made the survey performed the same service immediately after the collision, August 17, 1964. The estimate of repairs amounting to $3,415.20, was computed on prices existing at the time of the trial, and is said to represent the cost of necessary

---

1. Tamak Transportation Corporation and Tamak Gas Products Company will be hereafter referred to as "Tamak".

repairs of all damaged parts found to exist on the date of the last survey. There was evidence in the case that the ALAMO-1300 was not damaged in any way between the July, 1964 survey and the date the barge was placed in care of the plaintiffs. An effort was made to show that the barge suffered damages after its collision with the tow of the NAVIGATOR while floating unattended downstream. Taking into consideration all of the evidence introduced at the trial on the issue, the Court finds the damage proximately resulting to the ALAMO-1300 on account of its collision with the tow of the NAVIGATOR is the sum of $3,000.00.

The Court finds that Tamak suffered a loss as the direct and proximate result of the collision aforesaid in the sum of $3,429.07, computed as follows:

| | |
|---|---|
| Repairs to Barge | $3,000.00 |
| Towage | 333.31 |
| Surveyor Expense | 95.76 |
| | $3,429.07 |

The evidence is not sufficient to justify the Court to allow damages for the delay in the return of the barge. While the charter hire is shown to be approximately $250.00 per day, there appeared to have been a lease-purchase agreement. There was no evidence introduced to show that the monthly payments to be made under the charter agreement constituted fair hire for the barge. The barge has not been taken out of service

or repaired, and no evidence was introduced from which the Court can find the length of time necessary for the repairs. A finding cannot be made on conjecture, speculation or surmise. There can be no recovery for this item of damage.

## CONCLUSIONS OF LAW

### I.

This Court has jurisdiction of this action in Admiralty and venue is properly laid in the Northern District of Mississippi, Greenville division.

### II.

The burden of proof rests upon the plaintiffs to establish by a preponderance of the evidence the facts upon which rests their right to recover. Grace Line, Inc. v. United States Lines Co., 1961, S.D.N.Y., 193 F.Supp. 664, Aff'd., 2 Cir. 1962, 302 F.2d 933.

### III.

The statutory Rule of Navigation applicable to the issues involved in this case is contained in 33 U.S.C.A. § 343.[2] The manner of passing is within the discretion of the descending vessel which has the right-of-way. Pilot Rule 95.11 of Pilot Rules for Western Rivers, 33 CFR, § 95.01 through § 95.80, is applicable here.[3] The ascending vessel, in this case the SOUTHEASTERN, was under the statutory duty to give the descending

2. This rule in its pertinent parts provides:
   "When an ascending steam vessel is approaching a descending steam vessel on a river, the signals for passing shall be one distinct blast of the whistle by each vessel if passing port to port, and two distinct blasts of the whistle if passing starboard to starboard.
   "The pilot of the ascending steam vessel shall give the first signal for passing, which shall promptly be answered by the same signal by the pilot of descending steam vessel, if safe to do so, and both shall be governed accordingly; * * *". 33 U.S.C.A. Ch. 5, § 343.

3. "§ 95.11 Narrow channels.
   "When two steam vessels are about to enter a narrow channel at the same time,

the ascending steam vessel shall be stopped below such channel until the descending steam vessel shall have passed through it; but should two steam vessels unavoidably meet in such narrow channel, then it shall be the duty of the pilot of the ascending steam vessel to make the proper signals, and when answered the ascending steam vessel shall lie as close as possible to the side of the channel and either stop the engines or move them so as to give the boat only steerageway; and the pilot of the descending steam vessel shall cause his steam vessel to be worked slowly until he has passed the ascending steam vessel." 33 CFR, Ch. 1, § 95.11.

vessel, in this case the NAVIGATOR, the right-of-way.

## IV.

■■ Whether the area in question is a narrow channel or not, is a mixed question of fact and law. Skibs A/S Siljestad v. S/S Mathew Luckenbach, 1963, S.D.N.Y. 215 F.Supp. 667, 681. The size and depth of the water are key factors to be taken in consideration where determining what constitutes a narrow channel, Skibs A/S Siljestad v. S/S Mathew Luckenbach, supra. A three hundred foot channel has been held a narrow channel for purposes of Inland Waters Rule. 33 U.S.C.A. § 210, Barge Lake Farge Corp. v. The S.S. Saxon, 1960, E.D.Penn. 183 F.Supp. 132. The Court concludes that the area at the point of collision constituted a "narrow channel" for purposes of applying the Narrow Channel Rule of Pilot Rules for Western Rivers, 33 CFR § 95.11, supra.

## V.

The SOUTHEASTERN was guilty of a major statutory fault when, after moving to the left descending bank of the river, near the revetment, it failed to hold up until the NAVIGATOR with her tow had accomplished a safe passage, and made a movement to port to go into her crossing before such passage could be completed.

## VI.

The failure of the master of the NAVIGATOR to give a passing signal, did not contribute to the collision, nor did the failure of the vessels to give danger signals contribute thereto. "There is no duty to sound a danger signal when peril is discovered so late as to render a signal useless", Greenville Gravel Co. v. Illinois Farm Supply, 215 F.Supp. 560 (N.D. Miss.1963), Aff'd 5 Cir. 1964, 336 F.2d 494. Where the whole situation was apparent to all concerned and there is no proof that signals would probably have avoided the collision, as in the case sub judice, the failure to give signals is not actionable, Bouchard Transp. Co., Inc. v. Conners Machine Co., Inc. et al., 1942, 2 Cir., 129 F.2d 110, 111; Grace Line Inc. v. United States Lines Co., supra.

## VII.

The NAVIGATOR cannot be faulted for her actions when it appeared that her tow might come in contact with the tow of the SOUTHEASTERN.

## VIII.

The aforementioned faults of the SOUTHEASTERN were the sole cause of the collision.

## IX.

Since the collision was the sole fault of the SOUTHEASTERN, the only question left for determination is the amount of recovery against the SOUTHEASTERN, its owner and bareboat charterer, plaintiffs herein, by the intervening plaintiff, which is hereafter fixed.

## X.

The intervening plaintiff is entitled to recover from plaintiffs the cost of repairs to the ALAMO-1300 in the sum of $3,000.00, the towage incurred to transfer the ALAMO-1300 from Greenville, Mississippi, to West Memphis, Arkansas, amounting to $333.31, and expense incurred for the service of the Marine surveyor amounting to $95.76, totalling the sum of $3,429.07. The intervening plaintiff owes plaintiffs the sum of $3,200.00 for towage, less the sum of $733.25, advanced to Captain Murphy, or the sum of $2,466.75. After deducting said amount from the damages due the intervening plaintiff as aforesaid, a final award of $962.32 is due to be made in its behalf.

An appropriate final judgment will be entered by the Court.

### FINAL JUDGMENT

Pursuant to the Memorandum Opinion this day released, it is

Ordered and adjudged:

1) That plaintiffs, Sportsmen's Enterprises, Inc., and Two Twenty-Eight Ter-

minal Services, Inc., take nothing by their action herein from defendant, Union Barge Line Corporation;

2) That the complaint herein shall be and the same hereby is dismissed on its merits;

3) That the intervenor, Tamak Transportation Corporation, do have and recover of and from the plaintiffs above named, jointly and severally, the sum of Nine Hundred Sixty Two & 32/100 Dollars ($962.32), with interest at the rate of six percent (6%) per annum from this date until paid, and have execution therefor;

4) That the defendant and intervenor above named recover of and from plaintiffs above named, jointly and severally, their costs herein, as taxed, and have execution therefor.