**FLOWERS TRANSPORTATION, INC.,**
**and Flowers Transportation Company,**
**Ltd., Plaintiffs,**

v.

**AMERICAN RIVER TRANSPORTATION**
**COMPANY, in personam, and the M/V**
**ROBERTA TABOR, in rem, Defendants.**

No. GC 78–142–K–P.

United States District Court,
N. D. Mississippi,
Greenville Division.

Jan. 8, 1980.

Joel J. Henderson, Greenville, Miss., for plaintiffs.

Jimmie D. Marshall, Frank S. Thackston, Jr., Greenville, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this admiralty action, plaintiffs Flowers Transportation, Inc., and Flowers Transportation Company, Ltd. (Flowers) sue American River Transportation Company (American), *in personam*, and the M/V ROBERTA TABOR, *in rem*, for damage sustained to two barges, RF 307B and RF 515B, in the tow of the Flowers vessel M/V GLADYS FLOWERS. Flowers' injury resulted from a collision between the GLADYS FLOWERS and ROBERTA TABOR as the two vessels attempted to pass one another at Randolph Bend on the Lower Mississippi River. Defendants counterclaim for damage to Barge TCB 108, in the ROBERTA TABOR's tow. The parties stipulated that plaintiffs' damages amount to $29,380.94, and defendants' damage is $10,058.83. The court has jurisdiction of this cause under 28 U.S.C. § 1333 and Rule 9(h), F.R.Civ.P. After introduction of oral and documentary evidence, the court makes findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P., as follows:

## I. FINDINGS OF FACT

### A. *The Bend.*

Randolph Bend is several miles long, beginning at about mile 774, in the vicinity of Sunrise Towhead Light. The river begins to flow slightly to the east of due south below the light. Then, at about mile 771, it curves sharply to the west. A reef exists in the river between miles 770 and 771. The bend ends at Richardson's Landing, mile 769, which protrudes into the Mississippi from the south.

A red buoy, about midway between miles 770 and 771, marks the tip of a sandbar and the boundary of the navigable channel on the left descending shore. The right descending side of the navigable channel is lined with a series of black buoys. A vessel must ultimately change its heading by 90° in the course of navigating the several miles of the bend.

Several witnesses testified about the geography of the channel. Their estimates of the width of the navigable channel at mile 770, where the accident occurred, ranged from 1200 to 1800 feet and tended to center on 1500 feet. This figure matches that on a Corps of Engineers' map admitted into evidence. We therefore find as a fact that the navigable channel at mile 770 was, from the left descending shore to the black buoy line, 1500 feet wide on the date of the accident.

The current speed was from one to three miles per hour, which the witnesses characterized as a slow current; the river conditions were calm. The weather was clear, and no obstructions to visibility existed. There is a "set" or draft in the river to the left descending shore throughout the bend, with a strong set occurring at Richardson's Landing at mile 769.

### B. *The Collision.*

On October 11, 1978, the day of the accident, the ROBERTA TABOR had in tow twenty-two loaded barges arranged five long and four wide with two barges spiked on the port stern of the tow. The overall length of the flotilla was 1269.1 feet; the width of the tow measured 140 feet at the bow and 175 feet at the stern where the two barges were spiked onto the tow. The loaded barges drew 8½ to 9 feet of water. The GLADYS FLOWERS' tow consisted of twenty-four empty grain barges arranged

four wide and six long. The tow was 140 feet wide and the GLADYS FLOWERS combined with her tow was 1,480 feet in length.

Shortly before 10 a. m. on October 11, the GLADYS FLOWERS was approaching Randolph Bend from downriver. Her captain, Thomas Flint, at mile 768, made a general radio call to discover whether any river traffic was in the area above Randolph Light, about mile 770.3. Larry Drum, captain of the ROBERTA TABOR, answered the call. He responded that the ROBERTA TABOR was in the Sunrise Towhead Chute area, about mile 775 or 776. The two captains discussed passing each other and agreed on a one-whistle, or port-to-port, passage. They also discussed that the GLADYS FLOWERS might travel past Richardson's Landing and wait within the bend for the ROBERTA TABOR to pass. Drum testified that he told Flint to hold up underneath the red buoy and to be sure to be up the left descending shore high enough as he waited for the ROBERTA TABOR in the bend. According to Captain Flint, nothing about coming up to a red buoy was mentioned, but the two agreed for the GLADYS FLOWERS to hold up in the "pocket" above Richardson's Landing, at mile 770. The red buoy is .3 of a mile upriver from the "pocket." Flint testified that the "pocket" was the only reference to the agreed location. Drum claimed that he also told Flint that according to river talk there was shallow water on the black buoys lining the right descending side of the navigable channel. Drum stated that he told Flint he would try to steer the bend, or navigate it underway, rather than flank it, or float through the bend and back up to avoid hitting the shore. Flint did not recall Drum making reference to a reef or shallow water.

Captain John Holland of the M/V PEGGY MAYS overheard this conversation on his radio. The PEGGY MAYS, bound upriver, was secured below Richardson's Land-

ing when the accident took place. Upon arrival in the area, Holland had made a courtesy call to the ROBERTA TABOR to locate the PEGGY MAYS' position and to agree on a one-whistle passing. Holland corroborated Flint's testimony, stating that Flint and Drum agreed the GLADYS FLOWERS would get into the "pocket" above the point (Richardson's Landing) but that they discussed nothing else. Holland specifically did not hear the ROBERTA TABOR captain refer to shallow water at a reef or request the GLADYS FLOWERS to come behind the red buoy. Although Holland did not hear the two captains sign off from their radio conversation, he was of the opinion that he heard all that they said.[1] Holland has no relationship with either party and is a disinterested witness. We find as a fact that Flint and Drum agreed on a port-to-port passing at the "pocket" and that nothing was said about the GLADYS FLOWERS pushing up to the red buoy, nor did Drum mention the reef or shallow water condition between the two vessels.

After the radio conversation, the GLADYS FLOWERS sailed past Richardson's Landing and stopped at mile 770 about 10 feet off the left descending shore in the "pocket." Although witnesses asked at trial to locate the GLADYS FLOWERS on various charts and photographs pinpointed the vessel at several places within the bend, all who testified on the issue agreed that the GLADYS FLOWERS was within the "pocket." Those who located the GLADYS FLOWERS with reference to river mileage points stated she was at Randolph Bluff Light, mile 770. Again, we find most compelling the testimony of Captain Holland, who stated that the "pocket" is generally understood among rivermen to be at mile 770, where the geography of the bend is distinctive because the gradient of the surrounding bluff is less there and because a road lies on either side of the "pocket." The "pocket" refers to the bluff indentation itself.

1. The PEGGY MAYS' two radios were tuned to channels 13 and 16. According to Captain Isaac Sullivan, defendants' expert witness, channel 13 is used for navigation and traffic signals.

The GLADYS FLOWERS arrived in the "pocket" by 10:05 a. m., or 35 minutes before the collision. In the meantime, the ROBERTA TABOR continued downriver at full speed. At approximately mile 773, she cut to one-third ahead (about 3½ mph) and positioned herself in mid-channel. Captain Drum had intended to run close to the black buoy line on the right descending shore but decided instead to make the bend in mid-river because several pilots had reported that farther down shallow water existed on the buoy line. Drum testified that a reef extending across the river had also been reported. Drum wanted to mount the reef on a straight rudder in the middle of the channel.

At approximately mile 772 the GLADYS FLOWERS, about two miles away, came into the ROBERTA TABOR's field of view. Drum testified, however, that although he could see that the GLADYS FLOWERS was held up, he could not tell whether she was moving. Drum did not question the GLADYS FLOWERS about her course, and proceeded straight downriver. He and the GLADYS FLOWERS exchanged one-whistle signals when the two vessels were still three-fourths to one mile apart.

After Drum estimated he had passed the reef, he put on about a 20° steer. At this point the ROBERTA TABOR had closed to within approximately 1200 to 1400 feet of the GLADYS FLOWERS. By this time Drum had passed the place where he expected the GLADYS FLOWERS to be held up. The ROBERTA TABOR was then navigating at least 1000 feet wide of the black buoys and close to the edge of the navigable channel on the left descending shore.

Until Drum began to steer, Flint had not been alarmed at Drum's route because in Flint's view the course was appropriate for the ROBERTA TABOR to flank rather than to steer. Drum testified that after he began to steer, he attempted to contact the GLADYS FLOWERS to request her to move upriver out of the way. Flint denied that he received any call from Drum other than he would try to "shove the notch barges" by the GLADYS FLOWERS' tow.

Flint maintained that when the two tows were not more than 1200 feet apart, Flint blew a four-whistle danger signal and received no immediate response. Captain Holland of the PEGGY MAYS did not overhear Drum's alleged transmission to Flint, although he had overheard previous conversation between Drum and Flint on the channels to which his radio was tuned. See note 1 and accompanying text, supra. However, Ferman Kellum, pilot on the GLADYS FLOWERS, corroborated that Flint blew the danger whistle. We accept Flint's testimony on these issues.

Drum conceded that he did not reduce his one-third ahead speed until he was 40 to 50 feet from the GLADYS FLOWERS' tow. At that time he blew a danger signal and put his engines into reverse but was unable to avoid the collision. Flint did not attempt to move his vessel and tow from the ROBERTA TABOR's path because he did not believe he could get out of the way in time. Flint considered his vessel in the best position to minimize damage should a collision ensue. The port-to-port collision caused damage to both vessels' barges when the port stern barge of the ROBERTA TABOR struck and ripped out of tow the lead three barges of the GLADYS FLOWERS' port string.

## C. *The Reef.*

A reef existed in the river at a point between the tow of the GLADYS FLOWERS, as it held up in the "pocket," and the tow of the ROBERTA TABOR, as it approached the bend. Captain Drum estimated that the downriver edge of the reef was 1200 to 1500 feet from the head of the GLADYS FLOWERS' tow. His estimate, as drawn on a channel map, shows the reef's width, from the upriver to the downriver sides, to be in the neighborhood of 800 feet. Captain Flint's recollection, indicated on the same chart, is sharply at variance with Drum's. Flint located the reef some three-fourths to one mile upriver from the upper boundary of the reef as positioned by Drum. Austin Smith, defendants' expert hydrologist, located the reef 2500 feet fur-

ther downriver from Flint's estimate, measuring crest to crest. However, Smith did state that the reef as placed by Drum was about 1000 feet downriver from where Smith estimated its lower edge to be.

Smith arrived at his opinion by extrapolating between the crests of the reef as noted on a September 6 Corps of Engineers map and an October 13 Coast Guard Channel Report. He stated that although he could pinpoint the crest of the reef with reasonable accuracy, he could not determine the length or width of the reef and therefore offered no opinion on its configuration. The October 13 Coast Guard report, sounded only two days after the accident, placed the reef about where he did. We conclude that Smith's location of the reef is the most reliable. We find that the reef crested approximately 3900 feet upriver from the head of the GLADYS FLOWERS' tow, or at about mile 770.6, and that from the tow to the reef's downriver edge was about 2700 feet. We also find that the shape of the reef is not ascertainable from the testimony.

#### D. *Water Depth.*

Captain Drum testified that the water along the black buoy line was 16 to 18 feet until he left it for mid-channel. Other than the reef, he said, the water was good. Captain Flint testified that after 6 p. m. on October 11, when the GLADYS FLOWERS resumed her journey, she "went up easy" on the black buoys and encountered 12 feet of water. Flint also maintained that the reef was covered with 12 feet of water. Captain Lamprise of the M/V INEZ ANDREAS, who sailed downriver about 100 feet off the black buoy line during the afternoon of October 11, reported that he twice passed over water 10½ feet deep but did not touch bottom. Finally, Smith estimated the crest of the reef to be 10 to 11 feet under water but stated that the October 13 Coast Guard report would be more accurate than his extrapolations from the September 6 chart for determining depth along the black buoy line. The October 13 report measured depth at virtually the same low Memphis river gauge reading as October 11 and shows the minimum depth along the black buoy line to be 14 feet. It states that on October 13 the crest of the reef was at 10 feet.

We find as a fact that the depth of the water, at 100 feet off the black buoy line, or at an easy distance from it, was generally no less than 12 feet with occasional shallow spots of 10½ feet, and ample for navigation with barge drafts of no more than 9 feet. We further find that the reef crested farther out into the channel at 10 to 11 feet and that the water above and below the reef, in mid-channel, was substantially deeper and presented no hazard to navigation.

#### E. *Drum's Navigation.*

The ROBERTA TABOR went downbound wide off the black buoy line and came nearly broadside to the current when Drum gave a hard steer to starboard. Drum testified that he waited until he was across the reef to steer because he was afraid he would "bust up" his tow if he steered over it. He stated that crossing reefs is dangerous because of possible suction between the barges and the riverbed. According to Drum, the better practice is to travel straight over a reef rather than "slide" over it sideways because the latter maneuver increases the danger of losing barges. However, Captain Wilson, plaintiffs' expert, stated that mounting a reef with straight rudder is not necessary for a downbound vessel, but the maneuver sometimes becomes necessary for upbound boats because of their greater relative velocity due to current flow. Wilson maintained that a downbound vessel would not have to approach a reef as straight as an upbound vessel.

Flint, Kellum, Wilson, and J. B. Rice, operator of the boat store at Richardson's Landing, were in general agreement that under the existing water conditions the ROBERTA TABOR could easily have begun her turn above the reef and that no problem of breaking up the tow would have arisen had Drum traveled over the reef at

moderate speed. They testified that had Drum begun to maneuver further upriver, either by steering close to the black buoys or by flanking properly, the ROBERTA TABOR would not have experienced difficulty in the bend and would not have collided with the GLADYS FLOWERS. Captain Sullivan, defendants' expert, stated that a prudent navigator might have chosen to steer or flank the bend under the conditions which existed. Drum himself testified that he would have begun to steer sooner and consequently would have missed the GLADYS FLOWERS had he not feared the effects of the reef.

Drum further testified that his course was about on the sailing line of the channel as indicated by the river charts, and it is undisputed that the GLADYS FLOWERS was stopped near the sailing line. However, Flint stated that proper navigation on this bend was with reference to the black buoys which marked the navigable channel, and not to the sailing line. Flint's statement is buttressed by Kellum, the GLADYS FLOWERS' pilot, who testified that several southbound tows passed the GLADYS FLOWERS after the accident. None of these boats, said Kellum, asked the GLADYS FLOWERS to move. Kellum specifically remembered the INEZ ANDREAS, another vessel owned by defendant American, passed the GLADYS FLOWERS without incident.[2] Rice, who runs the boat store at Richardson's Landing, corroborated Kellum's observation.

These vessels navigated Randolph Bend without difficulty. None of them asked the GLADYS FLOWERS to move even though she remained at the place of collision, near the sailing line. We therefore conclude that any reliance by Drum on the sailing line to indicate the proper course was misplaced and that the black buoy line was the relevant navigational reference. We find that prudent pilots could have, and did, navigate the bend without regard to the sailing line.

Drum also said that the GLADYS FLOWERS had stopped in a bad place because of the left set in the current and the sharpness of the bend and that he had never passed another boat parked where the GLADYS FLOWERS was. Drum's testimony is corroborated to a certain extent by that of Captain Lamprise and Captain Sullivan, defendants' expert. Both stated that the GLADYS FLOWERS was in a bad place to stop and agreed that the GLADYS FLOWERS' location substantially increased the risk of collision. Lamprise further maintained that he had never seen a vessel parked in the "pocket" except in much higher water than existed on October 11. In comparison, Flint, Kellum, Wilson, and Rice testified that the "pocket" is a good place to wait and that it is customary for vessels to park there for passing. Holland had seen boats waiting there on at least one other occasion. We resolve this conflict in the evidence by finding that the "pocket" at mile 770 was a normal and proper place for an upbound vessel to stop during passage of a downbound vessel either steering off the black buoy line or flanking the bend.

---

2. Kellum estimated that the INEZ ANDREAS passed no closer to the GLADYS FLOWERS than 800 feet. However, Lawrence Lamprise, pilot of the INEZ ANDREAS, testified that his vessel came within 300 feet of the GLADYS FLOWERS. He concluded that he did not collide with the GLADYS FLOWERS only because he was "just perfect" that day. According to Flint, the INEZ ANDREAS sailed no closer than 500 to 600 feet of the GLADYS FLOWERS. We conclude that Flint's estimate, falling between the other two, is most accurate. We do not believe that the INEZ ANDREAS' passage was as perilous as Lamprise testified. Lamprise did not blow a danger signal, and proceeded ahead off the black buoys. He claimed that he attempted to radio the GLADYS FLOWERS from the Sunrise area, near the beginning of the bend, but that no one answered because the GLADYS FLOWERS and the ROBERTA TABOR were on a different channel. However, Lamprise was monitoring channels 13 and 16, which both vessels had earlier used and on which Captain Holland had heard them communicating. See note 1 and accompanying text, supra. Yet, Captain Sullivan testified that channel 13 is used for navigation and traffic signals, see id. Because of the inconsistencies in Lamprise's testimony and his failure to blow a danger signal, we find Lamprise's opinion that his passage was dangerous to be not only exaggerated but incredible.

Finally, Drum testified that had the GLADYS FLOWERS moved when he requested, he would have been able to navigate the bend without incident. Lamprise and Sullivan agreed that the GLADYS FLOWERS had sufficient time to push up out of the way when Drum began to steer after crossing the reef. Flint, however, said that he did not have time to move his vessel. Wilson corroborated Flint that by the time the ROBERTA TABOR began to steer, the GLADYS FLOWERS would not have been able to push up out of her path and avoid the collision. Mindful of Lamprise's credibility, see note 2 and accompanying text, supra, and that the two experts disagree, we accept Captain Flint's estimate of the capabilities of his vessel.

The evidence is uncertain as to whether the ROBERTA TABOR could have stopped had she reversed her engines rather than attempted to steer after she passed where Drum thought the reef was. The witnesses, however, did agree that the ROBERTA TABOR could have stopped within a tow-length, or approximately 1200 to 1400 feet. We find as a fact that Drum could have stopped the ROBERTA TABOR without difficulty had he reversed his engines shortly before he began to steer, or at least 1400 feet upriver from the head of the GLADYS FLOWERS' tow.

In sum, we find as a fact that the ROBERTA TABOR could have safely navigated around the bend under the existing water and channel conditions and with the GLADYS FLOWERS waiting in the "pocket" if Drum had commenced steering farther upriver and closer to the black buoys or had slowed his tow to execute a proper flank.

## II. CONCLUSIONS OF LAW

The Western Rivers Rules, 33 U.S.C. §§ 301–356, govern the conduct of vessels navigating the Mississippi River. Rule 26, id. § 351, the "general prudential" rule,

mandates that a pilot sail his vessel with due care, or "the ordinary precautions of good seamanship." G. Gilmore & C. Black, The Law of Admiralty § 7–11, at 509 (2d ed. 1975). See generally Movible Offshore, Inc. v. M/V Wilken A. Falgout, 471 F.2d 268, 274 (5 Cir. 1973). Drum's navigation of the ROBERTA TABOR must be evaluated in light of this standard.

We find no fault in Drum's decision to avoid the black buoy line and mount the reef in mid-channel. On the information available to him at the time—that the water on the black buoy line and the reef was shallow—proceeding down what presumably was the deepest part of the channel was one reasonable course to take. It can be determined, through hindsight, that under the existing water and channel conditions Drum need not have been concerned with the angle at which he crossed the reef so long as he crossed it at moderate speed, but we believe that Drum's decision to mount the reef on a straight rudder, even though erroneous, was not negligent. However, we do fault Drum for his failure to request the GLADYS FLOWERS to move or otherwise timely signal her of danger and for his subsequent maneuvers.

Rule 24, 33 U.S.C. § 349(a), states:

If, when steam vessels are approaching each other either vessel for any reason fails to understand, or regards as unsafe, the course or intention of the other, the vessel in doubt shall immediately so signify by giving several short and rapid blasts of her whistle, at least four, the danger signal.

Captain Drum clearly violated this rule. The GLADYS FLOWERS became visible to the ROBERTA TABOR at mile 772, or two miles upriver from the GLADYS FLOWERS' position. Drum could see that the GLADYS FLOWERS was held up but could not tell whether she was moving.[3] The

---

**3.** Plaintiffs also assert that Captain Drum violated 33 U.S.C. § 341a, which states: "Risk of collision can, when circumstances permit, be ascertained by carefully watching the bearing of an approaching vessel. If the bearing does not appreciably change such risk should be deemed to exist." We do not believe this statute applies to the case sub judice because it seems designed for the situation of two vessels underway. If one vessel is stationary, as here,

ROBERTA TABOR did not signal but continued downriver until she was three-fourths to one mile from the GLADYS FLOWERS. At that point the two vessels exchanged a standard, one-whistle passing signal.

By this time, if not earlier, Drum knew or should have known that the GLADYS FLOWERS was not held up under the red buoy where he claims to have asked her to be. Given his understanding that a reef was between the vessels, Drum should have realized that the GLADYS FLOWERS might be in his vessel's way. Yet Drum did not sound the danger signal or call the GLADYS FLOWERS by radio. Instead, he proceeded past the place he had expected the GLADYS FLOWERS to be and then, belatedly sensing that a collision was highly likely, he began to steer but advised Flint only that he would try to shove the notch barges by the GLADYS FLOWERS. At this time the heads of the two tows were 1200 to 1400 feet apart. Although Captain Flint sounded a danger signal when he observed the ROBERTA TABOR approach to within 1200 feet of the head of the GLADYS FLOWERS' tow, Captain Drum, nevertheless, did not give a danger signal until his tow was within 40 to 50 feet of the head of the GLADYS FLOWERS' tow. By this time it was, of course, far too late for Drum's danger signal to serve any useful purpose, as a collision was imminent. Indeed, as we have found, Captain Flint, at the helm of a stopped vessel, was unable to take timely evasive action on receiving Drum's message that he would try to shove by or when he blew a danger signal after observing the ROBERTA TABOR begin to steer only 1200 to 1400 feet upriver. Had Drum warned Flint before he began to steer, the GLADYS FLOWERS would have had ample opportunity to escape collision by moving from the ROBERTA TABOR's path to a place of safety.

Drum also violated Rule 21, 33 U.S.C. § 346, which provides: "Every steam vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse." By the time the ROBERTA TABOR was over the reef, Drum knew or should have known that risk of collision with the GLADYS FLOWERS existed. That Drum was or should have been aware of danger is demonstrated by his own testimony that he was afraid to pass over the reef on other than a straight, or perpendicular, course. With this thought in mind, Drum doubtless was nervously waiting to clear the reef so that he could maneuver to miss the GLADYS FLOWERS. However, after the ROBERTA TABOR passed the reef, she continued to steam downriver at one-third ahead rather than slacken her speed, stop and reverse, or take other evasive action.

The length of the ROBERTA TABOR and her tow was 1269.1 feet. Between the downriver edge of the reef and the head of the GLADYS FLOWERS' tow lay 2700 feet of deep water. The ROBERTA TABOR could have stopped in no more than 1400 feet. Thus, had Drum reversed engines immediately after clearing the reef, he would have been able to stop just short of the GLADYS FLOWERS. Even had the ROBERTA TABOR not come to a complete halt, damage to the tows of the two vessels would probably not have been as extensive. Drum was aware of the GLADYS FLOWERS' position for thirty minutes before the collision, yet he took no evasive action. Had Drum previously reduced the ROBERTA TABOR's speed, as required by Rule 21, his vessel could have stopped his tow a greater distance away from the GLADYS FLOWERS' tow. Instead, Drum attempted to steer rather than stop, and he did not reverse his engines until the stern barges in tow of the ROBERTA TABOR were only 40 to 50 feet from the GLADYS FLOWERS' tow. See In re M/V Fay Blackman, 437

the apparent bearing of the stationary vessel would change constantly unless the other vessel were sailing directly toward the stationary one. At any rate, the statute does not give rise to liability here because the ROBERTA TABOR was on a non-linear course and consequently pointed at the GLADYS FLOWERS only momentarily when she turned near the point of collision.

F.2d 542 (5 Cir. 1971) (same result on similar conduct). This situation presented a clear risk of collision, and "it is the risk of collision, not the collision itself, that masters must avoid." *Ocean S.S. Co. of Savannah v. United States*, 38 F.2d 782, 784 (2 Cir. 1930).

To summarize, Drum did not violate the general prudential rule in choosing to mount the reef and steer wide of the black buoy line, but he did fail to conform to riverboat pilots' standard of good seamanship in his subsequent failure to communicate and to navigate properly. In addition to this general duty to use due care, Drum specifically violated Rules 24 and 21, respectively requiring a danger signal in unsafe conditions and immediate slackening of speed or stopping and reversing engines when a risk of collision is apparent.[4]

Under the rule of *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), we consider whether defendants have shown any fault on the part of the GLADYS FLOWERS to require the apportionment of damages between the vessels. Defendants urge that the GLADYS FLOWERS violated the Narrow Channel Rule, 33 CFR § 95.11,[5] as developed by several decisions within the Fifth Circuit. *See Weathers Towing, Inc. v. M/V Herman Pott*, 570 F.2d 1294 (5 Cir. 1978) (per curiam); *Fay Blackman, supra; Bunge Corp. v. Lake Providence Dredging Co.*, No. GC 78–88–K–O (N.D. Miss. Oct. 12, 1979); *Sportsmen's Enterprises, Inc. v. Union Barge Line Corp.*, 306 F. Supp. 1376 (N.D.

Miss.1969). Specifically, defendants contend that the case at bar is indistinguishable from *Weathers, supra*, in which the Fifth Circuit affirmed the district court's decision that the Narrow Channel Rule applied to cast the ascending vessel solely at fault in the collision.

In *Weathers*, the M/V HERMAN POTT was downbound on the Upper Mississippi River at Scudder Bend, a horseshoe-shaped part of the river that bends some 180° over a distance of 10 miles. The HERMAN POTT had traversed nearly the entire bend when at Antelope Light she collided with the M/V ROBERT P. GIPSON. The ROBERT P. GIPSON was stopped against the left descending shore or on the outside curve of the bend.

■ One indicium of whether a channel is narrow under the rule is its width. *Weathers, supra* at 1295; *Union Barge, supra* at 1387. At the point where the ROBERT P. GIPSON and the HERMAN POTT collided, the river was "more than 1150 feet in width."[6] However, at the "pocket" in the case sub judice, the navigable channel was 1500 feet. After subtracting the maximum widths of the ascending flotillas from channel size, in *Weathers* the HERMAN POTT had about 1100 feet of clearance in which to pass the ROBERT P. GIPSON while in this case 1350 feet of the navigable channel remained for the ROBERTA TABOR to pass the GLADYS FLOWERS.[7] Thus, in both total width and in width less the dimensions of the ascending tows, the

**4.** Rule 18(b), 33 U.S.C. § 343(b), requires the pilot of a descending vessel to give the danger signal if he deems it dangerous to pass on the side indicated by the ascending vessel and if necessary, stop and back. To the extent that this rule applies, we treat it in common with Rules 21 and 24. The evidence does show without dispute that Drum, piloting the descending vessel, did not give a countermanding danger signal to Flint's one-whistle signal when the two vessels were at least three quarters of a mile apart.

**5.** "When two steam vessels are about to enter a narrow channel at the same time, the ascending steam vessel shall be stopped below such channel until the descending steam vessel shall have passed through it. . . . "

**6.** *See* the district court's Memorandum of Decision, No. GC 75–29–S, at 9 (Mar. 4, 1977). These facts are taken from the district court's Memorandum as well as from the Fifth Circuit's per curiam opinion.

**7.** The ROBERT P. GIPSON's barge was 50 feet wide. Subtracted from "more than 1150 feet" and with some allowance for ship-to-shore distance, we arrive at about 1100 feet. The GLADYS FLOWERS' flotilla was a maximum of 140 feet wide and rested 10 feet off the left descending shore. From 1500 feet, 1350 feet remain.

channel at the "pocket" in Randolph Bend was significantly broader than the one at Antelope Light in Scudder Bend.

Also important in determining whether a channel is narrow is its hydrography. *Union Barge, supra* at 1387; *see generally Fay Blackman, supra.* In both *Weathers* and the case sub judice, the river curved sharply to the right from the downbound vessel's point of view. The river's course in both cases caused a draft toward the left descending shore. However, in *Weathers* the set at the point of collision was "very strong," Memorandum of Decision at 8, *see* note 6, *supra*, whereas in the case sub judice, it merely existed at the accident site and did not become "strong" until Richardson's Landing, a mile below the "pocket." Moreover, in *Weathers* the river was at high stage, 570 F.2d at 1296, while at Randolph Bend on October 11 the river was at low stage. These data suggest that the force and velocity of the current were greater in *Weathers* than here.

■ The size of the channel at the "pocket" in Randolph Bend and the water conditions within it, compared with the conditions at Scudder Bend in *Weathers*, lead to the conclusion that the channel in the case sub judice is less likely a narrow channel than that in *Weathers*. In fact, the only comparison tending to the opposite result is that although their maximum widths were the same, the length of the HERMAN POTT's flotilla (1143 feet) was about 126.1 feet less than that of the ROBERTA TABOR (1269.1 feet). We are not convinced that this difference is significant. Moreover, application of the Narrow Channel Rule is based not only on the physical aspects of the water but also on "the character of the navigating use to which the water is put." *Weathers,* 570 F.2d at 1295. The latter part of this rule of law points up another important distinction between *Weathers* and the case sub judice.

The "pocket" in which the GLADYS FLOWERS was resting when struck is a

normal and proper place for an upbound vessel to stop during passage of a downbound vessel. In contrast, the *Weathers* district court expressly found that at Scudder Bend vessels customarily hold up more than two miles *below* the accident site and that the ROBERT P. GIPSON had a duty to hold up there rather than farther upriver at Antelope Light. *See* Memorandum of Decision at 8–10.[8] The use to which the water is put at these two accident locations is therefore distinct. At the "pocket" in Randolph Bend, river pilots await passage of downbound vessels, but the waters off Antelope Light in Scudder Bend are normally used only for navigation and not for waiting on downbound vessels.

■ The expert witnesses in the case gave conflicting opinions as to whether the Narrow Channel Rule should apply at mile 770, where the GLADYS FLOWERS held up in the "pocket." This, of course, is a mixed question of law and fact for the court to decide. Plaintiffs' witnesses voiced the opinion that vessels had often held up at this location for the passage of descending tows in low as well as high water and there was adequate room in the channel for safe passage. Defendants' witnesses maintained that even if the channel was satisfactory for passing in normal water, the reduced size of the navigable channel at low water stage, the presence of the reef in shallow water, and the existence of a set to the left descending shore would make the channel a narrow one within the meaning of the rule. We find on this record the decisive fact to be that other vessels similar in size and makeup to the ROBERTA TABOR that very day passed by the GLADYS FLOWERS holding up in the same position without hazard to safe navigation.

■ We therefore conclude that the "pocket" at mile 770 of Randolph Bend is not a narrow channel. The purpose of the rule reinforces our conclusion: "to prevent the development of situations which may

---

8. *See also Fay Blackman, supra* at 548: "[L]arge tows ordinarily avoid passing" and "vessels do not habitually meet in the narrow

stretch of water where the Fay Blackman positioned herself."

lead to collisions—by keeping an ascending vessel out of a narrow channel." *Weathers, supra* at 1296, *citing Fay Blackman, supra* at 547. In essence, the rule directs the court to inquire whether the "pocket" was a sensible place for the GLADYS FLOWERS to stop. We hold that it was [9] and attribute the sole fault of the collision to the RO-BERTA TABOR.

Let an order issue accordingly.

9. In so concluding, we also absolve Captain Flint of nonstatutory negligence.