**UNION OIL COMPANY OF CALIFORNIA, Plaintiff,**

v.

**The M/V ISSAQUENA, Her Engines, Machinery, Appurtenances, etc., In Rem, and Security Barge Line, Inc., In Personam, Defendants.**

**UNION OIL COMPANY OF CALIFORNIA, Plaintiff,**

v.

**The M/V ISSAQUENA, Her Engines, Machinery, Appurtenances, etc., In Rem, and Security Towing Company, Inc., In Personam, Defendants.**

**Nos. GC 7073–S, GC 7076–S.**

United States District Court,
N. D. Mississippi,
Greenville Division.

Dec. 8, 1971.

Fred C. DeLong, Jr., and James L. Robertson, of Campbell, DeLong, Keady, Robertson & Hagwood, Greenville, Miss., for plaintiff.

Clayton J. Swank, III, and J. Murray Akers, of Robertshaw, Merideth & Swank, Greenville, Miss., for defendants.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

This admiralty action is before the court for decision after an evidentiary hearing and the submission by the parties of briefs and proposed findings of fact and conclusions of law. This memorandum will include findings of fact and conclusions of law by the court as required by Rule 52(a) F.R.Civ.P.

Plaintiff, Union Oil Company of California (Union Oil), is a California corporation and the owner and operator of the M/V L. W. SWEET and the steel tank Barges P. O. 1901 and P. O. 2006. These vessels are documented vessels of the United States.

At all pertinent times the M/V ISSA-QUENA, a documented vessel of the United States, was owned by defendant Security Towing Company, Inc., and chartered to defendant Security Barge Line, Inc. The defendants were Mississippi corporations. On or about June 23, 1971, the defendants were merged by Articles of Merger filed with and approved by the Secretary of the State of Mississippi. The name of the surviving corporation is Security Barge Line, Inc. (Security).

At the time of the collision hereinafter mentioned the L. W. SWEET was a river towboat approximately 118 feet in length and 45 feet in breadth. She had a square tow of four empty gasoline or petroleum tank barges, with Barges P. O. 2006 and P. O. 1901 on the port side and Barges P. O. 2005 and P. O. 2901 on the starboard side. The overall length of the tow including the L. W. SWEET was 648 feet. The overall width of the tow, at the widest part, was 102½ feet. The stern barges were 2½ feet wider than the lead barges. The design and makeup of the tow of the L. W. SWEET constituted a semi-integrated tow and was designed for speed and maneuverability. The pilot of the L. W. SWEET was Captain M. C. Crutchfield, a licensed master pilot with vast experience. His experience on the river extended to vessels and tows of all sizes, including bargeline tows.

At the time of the collision the IS-SAQUENA was a towboat measuring 170 feet in length, 40 feet in width and 11 feet in depth. Her tow consisted of twenty-five (25) loaded dry-bulk cargo hopper barges, each being 195 feet in

length and 35 feet in width. The barges were loaded to approximately nine feet. The twenty-five (25) barges were made up of 5 long and 5 wide. The total length of the tow, including the ISSA-QUENA, was 1,145 feet. The width was 175 feet.

At about one o'clock in the morning of August 11, 1968 the ISSAQUENA and her tow, with Captain Gerald Harrington at the wheel, was beginning to navigate the crossing from below Cherokee Light to Stewart Bar Light in the vicinity of Mile 865 or Mile 866, Lower Mississippi River. At this point on the river the State of Tennessee is on the East and the State of Missouri on the West.

The crossing from below Cherokee Light to Stewart Bar Light for downbound vessels, crosses from the left to the right descending bank of the river. The channel for some distance above Cherokee Light is approximately 2000 feet wide, and there is virtually a straight reach of the channel from Merriwether Bend.

The channel immediately below Cherokee Light, as it turns to cross the river, narrows to approximately 1400 feet at the upper end of the crossing and to approximately 400 feet at the lower end. The channel, a short distance below Cherokee Light, makes a sharp right hand turn of approximately 90 degrees. Thereafter it proceeds across the river toward the right descending bank where it makes a left turn of approximately 90 degrees. The channel, as it crosses the river, is flanked by a rather large sandbar in the middle of the river on the left descending side of the channel and a willow bar on the right descending side. Both sides of the channel are marked with buoys—red buoys on the left and black buoys on the right. At the entrance to the crossing there is a strong left hand draft as a larger part of the current runs between the left descending bank and the middle bar. The current, however, in the crossing is relatively slack, on the black buoy line and moderate on the red buoy line. As the result of the physical characteris-

tics of the channel in the crossing and the method of navigation required by such characteristics, the channel of the crossing constitutes a "narrow channel".

The L. W. SWEET was moving down the river immediately behind the ISSA-QUENA and, because of the nature and size of her tow, could steer the crossing with ease provided the crossing was clear. The ISSAQUENA, because of the size and nature of her tow, could not steer the crossing and was required to use two distinct flanking maneuvers, one at the upper and the other at the lower end of the crossing. When making a flanking movement in the crossing, a bargeline tow such as the ISSAQUENA, must be diagonally across the channel. On such occasions there is not sufficient room for another vessel to pass with safety.

On the night in question, the weather was good and visibility at least two miles. There was a slight westerly wind which did not seriously affect the vessels in their navigation.

The ISSAQUENA met several northbound vessels before entering the crossing aforesaid. While the ISSAQUENA was nearing the crossing the L. W. SWEET overtook the M/V LILLIAN CLARK, a southbound bargeline boat, in Merriwether Bend. At this point the L. W. SWEET and her tow were averaging approximately 14 miles per hour.

As she entered the crossing the ISSA-QUENA slowed her forward movement and began to pick up her flank. When the ISSAQUENA started the flanking maneuver, she was proceeding downstream in a diagonal position across the channel, at approximately one or two miles per hour with no forward momentum. As the ISSAGUENA began flanking the crossing, the L. W. SWEET was at the lower end of the Merriwether Bend. It was at this point that Captain Harrington of the ISSA-QUENA called the M/V LILLIAN CLARK and informed her captain that the ISSAQUENA had entered the crossing low and the flanking man-

euver would take longer than usual due to meeting a vessel a short distance below Cherokee Light. Captain Crutchfield of the L. W. SWEET interrupted the radio conversation and informed Captain Harrington that the L. W. SWEET was the boat immediately behind the ISSAQUENA. Captain Crutchfield requested a passing agreement. Captain Harrington and Captain Crutchfield talked by radio on at least two occasions. Their conversations were overheard by the pilots of three vessels. One vessel was stationed below Cherokee Light and moving upstream, while the other two were above Cherokee Light, upstream from the L. W. SWEET and ISSAQUENA. As is usual under such circumstances there is some conflict in the evidence as to the details of these conversations.

Captain Crutchfield testified that upon contacting Captain Harrington he made known to Captain Harrington the size of his tow and requested a passing agreement. According to Captain Crutchfield, in response to this request Captain Harrington told him that his tow had overrun the red buoy and he was moving hard to prevent his tow from going aground; that there was ample room for the passing to be made; that Captain Crutchfield should come by on the black buoys and that he, Captain Harrington, would hold up until the L. W. SWEET had passed, at which time he would navigate the crossing. Captain Crutchfield also testified that they agreed on a "one whistle" passing and that he gave the blast, but did not hear the response from the ISSAQUENA on account of the vibration of his boat.

On the other hand, Captain Harrington testified that when Captain Crutchfield made the request to pass he was surprised at the request and told Captain Crutchfield that he was flanking the crossing, had the channel blocked and that he did not believe he could pass with safety, however, if Captain Crutchfield thought the passage could be made to "come on".

The other three witnesses who testified on this crucial issue corroborated to a large extent the testimony of Captain Harrington.

■ After a consideration of all evidence material to the issue concerning the passing agreement and the execution thereof the court makes the findings which follow. When Captain Crutchfield requested the passing agreement Captain Harrington informed Captain Crutchfield that he was engaged in flanking the crossing; that he was low on the red buoys and, while he had the "hole stopped up" and did not believe Captain Crutchfield could effect a safe passage, if he, Captain Crutchfield thought he could do so for him to "come on". Captain Harrington knew that Captain Crutchfield was an experienced pilot of many years experience on the river, and was willing to leave the decision to Captain Crutchfield, although Captain Harrington was in a better position to evaluate the matter than Captain Crutchfield. This constituted a consent and agreement on the part of Captain Harrington for the L. W. SWEET and her tow to pass the ISSAQUENA on a "one whistle" passing. After receiving Captain Harrington's consent to a "one whistle" passing Captain Crutchfield gave one blast of the whistle on his boat to signify the agreement. The evidence is not clear as to whether the ISSAQUENA returned the blast. If the signal was given Captain Crutchfield did not hear it. Captain Harrington testified at the hearing that he did not give the response, but, when giving a sworn question and answer statement to counsel for defendant on October 9, 1968, a short time after the collision, Captain Harrington stated that the signal was given. One thing is definite, however, the negative signal of four or more blasts of the whistle was not given by Captain Harrington. The issue as to whether the ISSAQUENA gave the "one whistle" signal becomes immaterial under the court's finding that the ISSAQUENA by radio communication assented to the passing.

Sportsmen's Enterprises, Inc. v. Union Barge Line Corp., 306 F.Supp. 1376, 1382 (N.D.Miss.1969).

After the radio conversations the L. W. SWEET moved into the slack water around the black buoy line and attempted to steer the crossing. A safer manner of passing would have been to flank the L. W. SWEET, for such a movement would have permitted Captain Crutchfield to have better control of his boat and tow. However, Captain Crutchfield thought he would steer the crossing and make a safe passage.

As the boats came into close contact with each other, the ISSAQUENA moved out into the channel and crowded the course of the L. W. SWEET. Captain Crutchfield, observing this movement of the ISSAQUENA, caused the L. W. SWEET and her tow to come full ahead, in an effort to clear the ISSAQUENA and her tow. However, this was not successful and the port side of the fourth compartment of the port lead barge, P. O. 2006 came in contact with the extreme port stern corner of the IS-SAQUENA, and a few seconds later there was a second impact wherein the bow rake of the Barge P. O. 1901, the port rear barge of the tow, rode upon the port stern of the ISSAQUENA.

Captain Harrington observed the movement of the L. W. SWEET on radar and when it became apparent that the L. W. SWEET might not successfully make the passage Captain Harrington brought his vessel to full ahead.

This collision occurred at a point in the channel where the width was about 1400 feet before the vessels reached the extreme narrow part of the channel. As the result of the collision the ISSAQUENA was knocked out of tow and the tow of the L. W. SWEET was broken.

From his knowledge of the river and the tow of the ISSAQUENA, Captain Crutchfield testified that the ISSAQUENA would necessarily have to navigate the crossing in a flanking movement. He further testified that had he known the ISSAQUENA was engaged in flanking the crossing he would not have attempted to pass, as he recognized that under such circumstances a passing could not have been accomplished with safety.

The damages to Barges P. O. 1901 and 2006 were of such a nature that the barges could not continue in service until repairs had been accomplished. The L. W. SWEET and her tow continued downstream and to Levingston Shipbuilding Company, Orange, Texas, where they were drydocked for a period of ten days. During this period repairs were made to both damaged barges.

The repairs to Barge P. O. 2006 cost $6,803.00, and to Barge P. O. 1901 the sum of $4,421.00. These repairs were reasonably necessary to repair the damages sustained in consequence of the collision and the costs thereof were reasonable.

While in the drydock plaintiff caused other repairs unconnected with the collision to be made to Barge P. O. 2006. The costs of these repairs were $9,031.00. Plaintiff also had extensive repairs made to the L. W. SWEET amounting to $11,947.00. These repairs were separate and apart from the repairs necessitated by the collision.

In addition to the repairs aforementioned plaintiff incurred the expense of a surveyor to determine the nature and extent of the damages to the barges. The cost to survey Barge P. O. 2006 was $134.75 and for Barge P. O. 1901, the sum of $118.25.

The L. W. SWEET and her tow were inactive for a period of ten days while in drydock awaiting the completion of the repairs. The crew of the L. W. SWEET consisting of Captain Crutchfield and nine others were maintained on active duty for this period, it being impractical for them to leave the ship for the period of the repair. The surveyor testified that the repairs occasioned by the collision necessitated a period of time from six to eight days. Plaintiff's witness Koebley testified that

the repairs made at the owner's request which were not connected in any way with the collision would take about five days. The repairs of the owner were made to the Barge P. O. 2006 and to the L. W. SWEET. From this evidence the court concludes that the time necessarily required to repair the damages occasioned by the collision to Barge P. O. 2006 and Barge P. O. 1901, required a period of six days. During this period of time the barges were unseaworthy and could not be utilized by plaintiff in the transportation of its products. Plaintiff suffered a detention loss as the result of the collision aforesaid during this period of time in the sum of $5,645.88, calculated as follows:

| | |
|---|---|
| 1) Costs of operation of the L. W. SWEET for 144 hours at $32.78 per hour, the sum of | $4,720.32 |
| 2) Costs of operation of the four barges comprising the tow of the L. W. SWEET for 144 hours at $.94 per hour, the sum of | 135.36 |
| 3) Loss of net operating income on the L. W. SWEET and her tow for 144 hours at $5.55 per hour, the sum of | 799.20 |
| Total | $5,654.88 |

■ The court concludes and finds that the combined fault of the ISSAQUENA and the L. W. SWEET resulted in the collision and the damages to the tow of the L. W. SWEET. Captain Harrington committed a statutory fault when, in the light of the existing circumstances, he consented to the passage of the L. W. SWEET and did not deny the request for passage by four or more blasts of the whistle of his boat. The applicable statutory navigation rule provides, inter alia: "[I]f the overtaken vessel does not think it is safe for the overtaking vessel to attempt to pass at that time, she shall immediately so signify by giving several short and rapid blasts of her whistle, not less than four".[1] Captain Harrington was under a duty to give the L. W. SWEET an immediate answer to the request for a passing agreement. See Coast Guard Regulations § 95.17 (33 C.F.R. § 95.17), which provides "When two steam vessels are in the overtaking situation, it is the duty of the steam vessel being overtaken to answer immediately a passing signal of the overtaking steam vessel, either by assenting with the same number of blasts or by dissenting with the danger signal". Captain Harrington admitted that he did not think it was safe for the L. W. SWEET to attempt to pass at the time, yet he did not give four or more short and rapid blasts of the ISSAQUENA's whistle, as the rule and regulation require. The failure to give this signal amounted to a clear violation of the rule and regulation. It is also clear to the court that if Captain Harrington had given the danger signal Captain Crutchfield would not have persisted in his attempt to pass the ISSAQUENA, and the collision would have been averted. Thus, the court concludes that Captain Harrington's failure to give the danger signal was a statutory fault which contributed to the collision.

The navigation rule set forth in 33 U. S.C.A. § 347(b) provides further "After an agreement has been reached the overtaken vessel shall in no case attempt to . . . crowd upon the course of the overtaking vessel". The ISSAQUENA crowded upon the course of the L. W. SWEET after Captain Harrington agreed to the passing, and violated this provision of the rule. The action of the ISSAQUENA in crowding upon the course of the L. W. SWEET proximately contributed to the collision.

The court finds that Captain Harrington's dereliction of duty comes within the scope of the rule of The Pennsylvania [2] where the court said:

". . . It must be conceded that if it clearly appears the fault could have nothing to do with the disaster, it may be dismissed from consideration. The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no

1. 33 U.S.C.A. § 347(b).

2. The Pennsylvania v. Troop, 19 Wall. 125, 22 L.Ed. 148 (1874).

more than a reasonable presumption that the fault, if not the sole concern, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute." [3]

In order to exonerate the ISSAQUENA from liability defendant urges upon the court the rule enunciated in Navigazione Alta Italia v. Keystone Shipping Company, 365 F.2d 422, 425 (5th Cir. 1966), where the court said:

"Where the gross negligence of one vessel is wholly sufficient in itself to account for the collision, but the other vessel has committed a technical fault not shown to have contributed to the collision, and where the error of the latter is minor, doubt as to the latter's conduct will be resolved in her favor. * * * Furthermore, where the active fault of one vessel so flagrantly and heavily outweighs the passive faults of omission of the other vessel, the interests of justice are best served by condemning the more culpable vessel completely."

The rule in that case does not apply in the case sub judice because the evidence here shows that the fault of the ISSAQUENA was not "a technical fault not shown to have contributed to the collision", where the error is minor; neither did the fault of the L. W. SWEET, so flagrantly and heavily outweigh the fault of the ISSAQUENA that the interest of justice would be best served by condemning the L. W. SWEET completely.

The plaintiff concedes that the evidence shows that the L. W. SWEET was guilty of fault which proximately contributed to the collision. The navigation rule aforesaid provides that "every vessel, overtaking any other, shall keep out of the way of the overtaken vessel". 33 U.S.C.A. § 347(a). The rule provides further in paragraph (b) that "under no circumstances shall the overtaking vessel attempt to pass until such time as they have reached a point where it can be safely done". Under the circumstances surrounding the L. W. SWEET at the time the court agrees that Captain Crutchfield was guilty of both statutory and non-statutory faults which directly and proximately contributed to the collision.

■ The court, therefore, concludes that both vessels were to blame for the collision and that the mutual fault rule applies. In such cases the damages suffered by the parties are divided equally, irrespective of the degrees of fault. See The Pennsylvania v. Troop, *supra*; Gilmore & Black, The Law of Admiralty (1967) § 7–4; 15 C.J.S. Collision § 186. In C.J.S. the rule is stated in this language: "In admiralty, but not under the common law, mutual fault of vessels resulting in collision requires an equal division of damages irrespective of the degrees of negligence attributable to the vessels, unless gross on the one hand and very slight on the other". In the action sub judice the only damages shown by the evidence to have been occasioned by the collision were sustained by plaintiff.

The court finds that plaintiff is entitled to recover from defendant one-half of the damages sustained by plaintiff as the result of the collision mentioned above. The total damages are calculated as follows:

| | |
|---|---|
| 1) Costs of repairs to Barge P. O. 2006, the sum of | $ 6,803.00 |
| 2) Costs of repairs to Barge P. O. 1901, the sum of | 4,803.00 |
| 3) Survey of Barge P. O. 2006, the sum of | 134.75 |
| 4) Survey of Barge P. O. 1901, the sum of | 118.25 |
| 5) Detention costs of the L. W. SWEET and her tow | 5,654.88 |
| Total | $17,513.88 |

Plaintiff is therefore entitled to recover from defendant the sum of $8,756.94 and costs of suit. The recov-

3. Id. 19 Wall. at 136, 22 L.Ed. at 151.

ery bears interest at six percent per annum from August 11, 1968, the date upon which the collision occurred. Petition of Canal Barge Co., 323 F.Supp. 805, 823 (N.D.Miss.1971).

The court has not overlooked the argument of counsel that defendant should not be charged with the chemist and gasfreeing charges of the two damaged barges because the evidence shows that the barges were due for biannual inspections a short time after the collision at which time plaintiff would necessarily have incurred such expense. For this reason defendant contends plaintiff has not suffered a loss in connection with such charges as a consequence of the collision.

The fact remains that plaintiff was forced to have this work performed in order to make the repairs occasioned by the collision. It must be treated as a matter of indifference to defendant, the tort-feasor, that plaintiff gets an incidental benefit from the work necessarily performed in order to restore the barges to seaworthy condition. Clyde S. S. Co. v. City of New York, 20 F.2d 381 (2nd Cir. 1927).

An appropriate judgment will be entered by the court.